| | | |
|---|---|---|
| SATHEESH KANNAN MARIMUTHU, | ) | |
| BALAMURUGAN MARIMUTHU, | ) | |
| MURUGANANDAM ARUMUGAM, | ) | |
| MURALIDHARAN ARUMUGAM, | ) | Civ. No. 1:13-cv-00499-MAC-ZJH |
| SATYANARAYANA ELLAPU, MOORTHY | ) | |
| NADHAMUNI, RAJENDRAN SAPPANI, | ) | **FIRST AMENDED COMPLAINT** |
| RAJENDRAN SUBRAMANI, VENKATA | ) | **AND JURY DEMAND** |
| SATYA SIVAGI RAO TALABATHULLA, and | ) | |
| SAMMANASUNATHAN SILUVAIMUTHU, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SIGNAL INTERNATIONAL LLC, SIGNAL | ) | |
| INTERNATIONAL, INC., SIGNAL | ) | |
| INTERNATIONAL TEXAS, G.P., SIGNAL | ) | |
| INTERNATIONAL TEXAS, L.P., MALVERN C. | ) | |
| BURNETT, GULF COAST IMMIGRATION | ) | |
| LAW CENTER, L.L.C., LAW OFFICES OF | ) | |
| MALVERN C. BURNETT, A.P.C., GLOBAL | ) | |
| RESOURCES, INC., SACHIN DEWAN, and | ) | |
| DEWAN CONSULTANTS PVT. LTD. (a/k/a | ) | |
| MEDTECH CONSULTANTS). | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

## INTRODUCTION

1.     This is a human trafficking case brought by Indian workers who were trafficked

into the United States through the government's H-2B guest worker program.  Plaintiffs were

trafficked to the state of Texas in order to provide labor and services to Signal International, Inc.,

Signal International, LLC, Signal International Texas, G.P., and Signal International Texas, L.P.

(collectively, "Signal").  In an effort to procure a cheap, compliant and expendable labor source,

Defendants targeted Indian workers, recruiting Plaintiffs for positions as pipefitters and welders

with Signal using false promises of assistance in applying for and obtaining permanent residence in the United States. Defendants then bilked Plaintiffs out of tens of thousands of dollars in "recruitment fees" (for which Plaintiffs assumed massive debt), trafficked them into the United States, forced them to live in squalid conditions in a gated, guarded, isolated labor camp, and required them to pay exorbitant sums for the "privilege" of living in these repulsive conditions. If Plaintiffs complained, they were threatened with adverse immigration and employment action and the resulting prospect of financial ruin. Defendants did not treat non-Indian workers in the same manner.

2.      Plaintiffs are all former employees of Signal's Orange, Texas facility. Plaintiffs bring this action to recover for the unlawful and fraudulent conduct of Signal and its agents: Malvern C. Burnett; the Law Offices of Malvern C. Burnett, A.P.C.; Gulf Coast Immigration Law Center, LLC; Sachin Dewan; Dewan Consultant Pvt. Ltd.; Michael Pol; and Global Resources, Inc. (the "Agents").[1]

3.      Signal is a Gulf Coast-based marine and fabrication company. Faced with a labor shortage and significant volume of work in the wake of Hurricane Katrina, Signal sought to recruit several hundred Indian workers for positions as welders and pipefitters in Signal's facilities in Orange, Texas and Pascagoula, Mississippi.

4.      Signal retained the Agents to assist in the recruitment process. Specifically, Signal retained Michael Pol and his company Global Resources, Inc. (collectively referred to as

---

[1]      On June 13, 2013, Michael Pol filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the Southern District of Mississippi (Case No. 13-51168-KMG). Due to the automatic bankruptcy stay, Michael Pol has not been included as a defendant in this action.

"Pol" unless a distinction is drawn), a labor recruitment firm based in Mississippi; attorney Malvern C. Burnett and his law firms, the Law Offices of Malvern C. Burnett and Gulf Coast Immigration Law Center, LLC (collectively referred to as "Burnett" unless a distinction is drawn); and Sachin Dewan and his company, Dewan Consultants Pvt. Ltd. (collectively referred to as "Dewan" unless a distinction is drawn), a labor recruitment firm in India. Signal also executed a power of attorney authorizing Dewan Consultants to recruit for Signal abroad.

5.     To minimize cost to Signal, Defendants and Pol designed a scheme in which the workers would pay for their own recruitment, immigration processing, and travel, which was memorialized in the April 18, 2006 Skilled Worker Agreement between Signal and Global. Under this scheme, any expenses and fees not paid up front by the workers would be paid by Global. Global, in turn, would deduct amounts from the workers' wages in order to recoup those expenses and fees directly from the workers. Signal, however, would pay nothing.

6.     By at least mid-2006, the Agents and, upon information and belief, representatives of Signal began traveling to India to recruit workers, including Plaintiffs. In newspaper advertisements and in-person meetings, Defendants and Pol promised to provide stable employment and assist Plaintiffs and other workers in applying for and obtaining a green card for permanent residence in the United States. In exchange, Plaintiffs and other workers were required to pay for "recruitment fees" to the Agents—ranging anywhere from $10,000 to $25,000. Defendants and Pol further represented that Plaintiffs' families would be able to join them in the United States.

7.     To alleviate any concerns about the potential living conditions in the United States, Defendants and Pol represented during in-person meetings that the living conditions would be comparable to those some of the Plaintiffs described experiencing in Singapore and

Dubai—which included, for example, a shared two-bedroom apartment, quality food, transportation to and from the job site, and one trip back to India per year.

8. Because Signal's need for workers was immediate, Defendants and Pol told Plaintiffs they would first acquire temporary work visas (H-2B) because the visas could be obtained faster than green cards, but that Defendants would also apply for green cards on Plaintiffs' behalf.

9. Lured by Defendants' fraudulent promises of legal and permanent work-based immigration to the United States for themselves and their families, Plaintiffs paid the exorbitant recruiting fees to take advantage of the seemingly promising opportunities, causing themselves and their families to incur massive debt. Indeed, to cover the recruiting and immigration fees Plaintiffs often had to sell family assets, take out loans secured by real property and jewelry, borrow money with high interest rates, and otherwise incur life-altering debt. Plaintiffs undertook such debt and paid the recruiting and immigration fees in reasonable reliance on Defendants' promises. In further reliance on Defendants' promises, some Plaintiffs relinquished stable employment opportunities in Singapore and elsewhere.

10. Defendants, however, had no intention of making good on their promises to assist Plaintiffs in applying for and obtaining permanent residency. To be sure, Defendants did not take—indeed, had no intention of taking—steps to assist Plaintiffs in applying for or obtaining permanent residency. In fact, at the suggestion of its Agents, Signal represented to the United States government that it was employing the Indian workers (including Plaintiffs) only temporarily and that they would be returned to India "within the . . . year." Moreover, internal correspondence among Signal management from May 2006 reflects that "[a]ll [Signal is] doing now is bringing the workers in under the H2B program." Defendants brought Plaintiffs to the

United States through the temporary H-2B guestworker visa program despite knowing, and failing to disclose, that the guestworker program was fundamentally incompatible with filing for green cards.

11.     Defendants never informed Plaintiffs that they had no intention of assisting Plaintiffs in applying for or obtaining green cards.  Nor did Defendants ever disclose to Plaintiffs the representations they made to the United States government regarding the temporary nature of their employment and residence.  Plaintiffs were simply unaware that Defendants' promises regarding employment and permanent residency were false and relied on the false promises to their detriment.

12.     Upon arrival in the United States, Signal required Plaintiffs to live in an isolated, Indian-only labor camp located outside of Orange, Texas (the "Texas Labor Camp").  Contrary to Defendants' representations regarding living conditions, the conditions at the Texas Labor Camp were horrid.  Plaintiffs were forced to live in cramped trailers—containing up to 24 men—with little to no privacy.  The trailers were so crowded some Plaintiffs had to sleep on their luggage.  The trailers had insufficient bathroom facilities (one or two toilets) that were rarely cleaned, which created not only an awful smell but also unsanitary living conditions.  Food was available only at certain hours and was often rotten.  As a result of the conditions, several of the residents became sick.  The camp was also fenced, gated, and guarded, such that Plaintiffs felt they were being imprisoned.

13.     As with the "recruitment fees," the cost to live at the Texas Labor Camp was borne by Plaintiffs.  Indeed, Signal charged Plaintiffs mightily for the "right" to endure the horrible conditions at the camp—deducting $35 per day seven days a week ($1,050 per month) out of the Plaintiffs' pre-tax earnings.  If workers asked to live off-site, Signal informed them

that it would <u>still</u> deduct $1,050 per month from their income, effectively prohibiting workers from seeking more humane and sanitary conditions.

14.     Significantly, non-Indian workers were not placed in guarded labor camps, were not subjected to squalid living conditions, and did not have exorbitant room and board fees deducted from their pre-tax earnings.

15.     The Indian workers at the Texas Labor Camp, including Plaintiffs, were also subjected to different, less favorable employment conditions than non-Indians.     Upon information and belief, Indian workers were assigned projects that were more difficult and more dangerous than those assigned to non-Indian workers, received terms and conditions of employment that were different from and less favorable than non-Indian employees, and were subjected to offensive anti-Indian diatribe and repeated threats of deportation.

16.     To prevent the Indian workers from complaining, Defendants deceived them regarding their immigration status, threatened them with loss of immigration status and deportation, and generally perpetrated a campaign of psychological coercion and fraud designed to render Indian workers compliant, intimidated, and unable to leave Signal's employ.     As an additional element of control, Signal required Plaintiffs and other Indian workers to set up direct deposit bank accounts to which Signal maintained access.     These accounts effectively permitted Signal to control workers' ability to leave the facility by threatening to cut off access to the accounts.     Upon information and belief, Signal did exactly that to an Indian worker who had fled the Pascagoula, Mississippi facility.

17.     Faced with crushing debt and fearful of the possibility of deportation by Signal should they complain, Plaintiffs felt compelled to continue working for Signal despite the

dreadful conditions at the Texas Labor Camp, the extortionate room and board fees, and the discriminatory employment conditions. Simply put, Plaintiffs felt that they had no other option.

18. The compulsion Plaintiffs felt to continue working at Signal only increased when they learned about the events that transpired at the Pascagoula, Mississippi facility on March 9, 2007. Upset that workers were complaining about conditions at the facility, Signal decided to terminate and forcibly send five of the more vocal Indian workers back to India. Signal locked the gate at the Pascagoula facility, preventing workers from leaving, rounded up and detained the vocal workers, and informed them that they were being deported. One of these workers was so distraught over the threat of returning to India without paying the debt he incurred over the recruitment fees that he attempted to commit suicide. When news of the events and the attempted suicide traveled to the Texas Labor Camp, Plaintiffs became even more afraid to complain about the conditions they had been subject to. Understandably, Plaintiffs feared that they would be returned to India and/or physically harmed if they did so.

19. Ultimately, less than a year-and-a-half after coming to the Texas Labor Camp, Plaintiffs were either terminated or told they were being sent to work at the Pascagoula, Mississippi facility for lower wages. Faced with the latter prospect, some Plaintiffs escaped and fled the Texas Labor Camp.

20. At no point did Defendants apply for or assist Plaintiffs in obtaining permanent residency for themselves or their families. At no point did Defendants refund the tens of thousands of dollars in recruitment and immigration fees Plaintiffs paid in reliance on Defendants' false promises. And at no point did Defendants compensate or offer to compensate Plaintiffs for the conditions they were forced to endure at the Texas Labor Camp. Indeed, at no point did they even offer an apology. Instead, Defendants maintain that how they treated

Plaintiffs and the other Indian workers was both lawful and moral. This mistaken viewpoint was most recently espoused by Signal's CEO in a press release, brazenly declaring that Signal "treated [the Indian workers] with dignity and respect just as we treat each and every Signal employee."

21.     Signal's self-delusion aside, Plaintiffs were victims of reprehensible conduct. Plaintiffs assert claims arising from violations of their rights under the Victims of Trafficking and Violence Protection Act ("TVPA"), the Civil Rights Act of 1866 (42 U.S.C. § 1981), the Ku Klux Klan Act of 1871 (42 U.S.C. § 1985), and claims for damages arising from fraud, negligent misrepresentation, and breach of contract.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 18 U.S.C. § 1595(a) (civil trafficking), and 28 U.S.C. § 1343 (civil rights).

23.     This Court has supplemental jurisdiction over causes of action based on state law pursuant to 28 U.S.C. § 1367(a), as the state law claims arise out of the same nucleus of facts that support the federal claims.

24.     Additionally, this Court has personal jurisdiction over Signal entities pursuant to Fed. R. Civ. P. 4(k) and Texas Code § 17.042, because they are registered to do business in Texas, maintain a continuing business presence in the state, operated the Orange, Texas facility and Texas Labor Camp where the Plaintiffs worked and resided and where Signal engaged in wrongful conduct, and a substantial portion of the communications, transactions, events, or omissions underlying Plaintiffs' claims occurred either in Texas or to secure labor for Signal's Orange, Texas facility.

25.     This Court also has personal jurisdiction over the other Defendants under Fed. R. Civ. P. 4(h) and Texas Code § 17.042, because they recruited Plaintiffs for employment at Signal's Orange, Texas facility, had substantial business contacts with Texas, and a substantial portion of the communications, transactions, events, or omissions underlying Plaintiffs' claims either occurred in Texas or occurred to secure labor for Signal's Orange, Texas facility.

26.     Venue is appropriate in the Eastern District of Texas under 28 U.S.C. § 1391 as Defendants engaged in human trafficking, violations of Plaintiffs' civil rights, fraud, misrepresentation and breach of contract in this judicial district.

## PARTIES

### *Plaintiffs*

27.     Plaintiffs are from India and are of Indian alienage, race and ethnicity.   The Plaintiffs were all recruited by Defendants in or about 2006 to work at Signal's Texas Labor Camp.  Each of the Plaintiffs paid between $15,000 - $25,000 in "recruitment fees" to the Agents in the belief that Defendants would assist them in obtaining green cards for Plaintiffs and their families.

28.     Plaintiff Satheesh Kannan Marimuthu was recruited by Defendants beginning in or around December 2006 as a fitter.  He arrived in the United States on or around February 15, 2007.

29.     Plaintiff Balamurugan Marimuthu was recruited by Defendants beginning in or around August 2006 as a fitter.  He arrived in the United States on or around December 13, 2006.

30.     Plaintiff Muruganandam Arumugam was recruited by Defendants beginning in or around May 2006 as a welder.  He arrived in the United States on or around February 1, 2007.

31.    Plaintiff Muralidharan Arumugam was recruited by Defendants beginning in or around March 2006 as a fitter and welder.  He arrived in the United States on or around December 11, 2006.

32.    Plaintiff Satyanarayana Ellapu was recruited by Defendants beginning in or around June 2006 as a welder.  He arrived in the United States on or around December 13, 2006.

33.    Plaintiff Moorthy Nadhamuni was recruited by Defendants beginning in or around November 2006 as a fitter.  He arrived in the United States on or around February 15, 2007.

34.    Plaintiff Rajendran Sappani was recruited by Defendants beginning in or around November 2006 as a fitter.  He arrived in the United States on or around December 18, 2006.

35.    Plaintiff Rajendran Subramani was recruited by Defendants beginning in or around late 2006 as a welder and fitter.  He arrived in the United States on or around February 15, 2007.

36.    Plaintiff Venkata Satya Sivagi Rao Talabathulla was recruited by Defendants beginning in or around May 2006 as a welder.  He arrived in the United States in or around December 2006.

37.    Plaintiff Sammanasunathan Siluvaimuthu was recruited by Signal beginning in or around November 2006 as a welder.  He arrived in the United States in or around December 14, 2006.

### *Defendants*

38.    Signal operates a marine and fabrication business in the Gulf Coast region that includes offshore drilling rig overhaul, repair, upgrade, and conversion.

39.     Upon information and belief, Defendants Signal International, LLC and Signal International, Inc. are corporations organized under the laws of Delaware and have facilities located in Orange, Texas, in addition to other locations in the Gulf Coast region.

40.     Upon information and belief, Defendant Signal International Texas, G.P. is a general partnership organized under the laws of Texas and employed the labor for Signal International, LLC and Signal International, Inc. at the Texas Labor Camp.

41.     Upon information and belief, Defendant Signal International Texas, L.P. is a limited partnership of Signal International, LLC and Signal International Texas, G.P. organized under the laws of Texas.

42.     Upon information and belief, all policies, money for payroll, corporate governance, and legal advice for Defendant Signal International Texas, G.P. was provided by Signal International, LLC.

43.     Upon information and belief, all policies, money for payroll, corporate governance, and legal advice for Defendant Signal International Texas, L.P. was provided by Signal International, LLC.

44.     Upon information and belief, Defendant Signal does not distinguish the roles of the Signal entities, including but not limited to, which entity paid Plaintiffs.

45.     Upon information and belief, Defendant Signal International, LLC executed contracts relevant to this Complaint in the name of Signal International, Inc.

46.     Upon and information and belief, Signal did not document which entity employed Plaintiffs.

47.     Upon information and belief, Defendant Signal International, Inc. is the sole member of Defendant Signal International, LLC.

48.     Upon information and belief, Defendant Signal International, LLC and Signal International, Inc. acted as agents and/or alter egos of Signal International Texas, G.P. and Signal International Texas, L.P. at all times relevant to the claims set forth herein.  At all relevant times, Defendant Signal International, Inc. had knowledge of and consented to the actions of Defendant Signal International, LLC, Signal International Texas, G.P. and Signal International Texas, L.P.

49.     Defendant Global Resources, Inc. ("Global") is a Mississippi corporation engaged in the business of recruiting skilled foreign workers to work in the United States, including Texas.  Upon information and belief, Michael Pol was the sole corporate officer of Global at all relevant times and entered into contracts for Global with the other Defendants and Plaintiffs in connection with providing labor for the Texas Labor Camp.  Through Michael Pol, Global worked to recruit workers for Signal's Orange, Texas facility.

50.     Defendant Dewan Consultants Pvt. Ltd. (a/k/a Medtech Consultants) is a private limited liability company organized under the laws of India.  Dewan Consultants has substantial business contacts with Orange, Texas and recruited Indian workers, including Plaintiffs, for employment in Texas.  Defendant Sachin Dewan is the Director of Dewan Consultants and has had substantial business contacts with Orange, Texas, including recruiting Indian workers for employment in Orange, Texas.  At all relevant times, Sachin Dewan acted as the agent or alter ego of Dewan Consultants.

51.     Defendant Malvern C. Burnett is an attorney who practices in the Gulf Coast region and resides in New Orleans, Louisiana.  He performed legal work associated with the Plaintiffs' employment in Orange, Texas, helped to recruit Plaintiffs, filed for visas on Plaintiffs' behalf, and collected legal fees from Plaintiffs.  At all relevant times, Burnett had an attorney-client relationship with Plaintiffs, including both before and after Plaintiffs arrived in Texas.  In

addition, at all relevant times, Burnett had attorney-client and business relationships with other Defendants.

52.     Defendant Law Offices of Malvern C. Burnett, A.P.C. ("Burnett Law Offices") is a professional law corporation organized under Louisiana law. Upon information and belief, Malvern C. Burnett is the registered agent, sole member and/or corporate officer of Burnett Law Offices.

53.     Defendant Gulf Coast Immigration Law Center, LLC ("Gulf Coast Immigration") is a Louisiana limited liability corporation.  Upon information and belief, Malvern C. Burnett is the registered agent, sole member and/or corporate officer of Gulf Coast Immigration.

54.     Upon information and belief, Defendants Burnett, Burnett Law Offices, and Gulf Coast Immigration constituted a joint venture and/or were alter egos of each other in that all entities have the same corporate mailing address, intermingle business assets, do not operate at arms' length, and Burnett is the registered agent and sole member and/or corporate officer for Burnett Law Offices and Gulf Coast Immigration.

55.     At all relevant times, Burnett, Dewan, and Pol acted as agents and/or representatives of Signal.  Burnett, Dewan, and Pol were acting within the course and scope of their agency at all relevant times and Signal had full knowledge of their acts and consented, permitted, authorized and ratified, expressly and/or impliedly, the acts performed by Burnett, Dewan and Pol as alleged in this complaint.

56.     At all relevant times, the Defendants were engaged in a joint venture with each other to recruit Plaintiffs, along with other Indian workers, to work for Signal at the Orange, Texas facility. The Defendants entered into various written and oral agreements evidencing their agreement to accomplish such recruitment and each Defendant acted within the course and scope

of the venture and those agreements. Defendants each had full knowledge of the actions of the other Defendants set forth in this Complaint and consented, permitted, authorized and ratified, either expressly or impliedly the actions of the other Defendants.

## SPECIFIC ALLEGATIONS

### *Signal Arranged for Dewan, Burnett, and Pol to Bring Temporary Workers to the United States*

57.     The destruction caused by Hurricane Katrina presented Signal with the potential to take on lucrative new work fixing damaged oil rigs, ships, and other machine platforms. As a result of the hurricane, however, some of Signal's workforce had left the Gulf Coast area, and Signal was in need of additional laborers—particularly skilled fitters and welders.

58.     In early 2006, Pol approached Signal about providing additional workers for their operations. He informed them that he could provide skilled fitters and welders from India to work for Signal at no cost to Signal.

59.     Pol explained to Signal that he would work with Burnett and Dewan to recruit the workers and obtain the appropriate immigration status for such workers, but that the workers, including Plaintiffs, would pay for all costs and fees associated with the recruitment process, immigration processing, and travel to the United States. Signal would pay the workers, including Plaintiffs, between $14 - $18/hour, depending on each worker's skill level.

60.     Signal and Global executed a Skilled Worker Recruitment Agreement (the "Recruitment Agreement") on or about April 18, 2006, which set forth certain terms for Michael Pol and Global to recruit foreign skilled workers for employment at Signal "under the 'H-2B' temporary program and/or the 'permanent residence' process." The Recruitment Agreement required Global to be responsible for delivering the workers "at no cost to Signal", including paying for all costs associated with recruitment, transportation, and entry into the United States

by the foreign workers.  The costs incurred by Pol and Global were to be paid by the foreign workers, including Plaintiffs.

61.     Dewan and Signal entered into a power of attorney on or about June 19, 2006, which permitted Dewan to act as Signal's "representative in India to facilitate the recruitment of skilled workers to the United States of America" for employment with Signal.  This power of attorney authorized Dewan to advertise, conduct seminars, conduct skills tests and sign necessary legal documentation related to the recruitment of skilled workers to work in the United States for Signal.

62.     In approximately mid- to late-2006, Signal entered into an attorney-client relationship with Burnett with respect to legal issues related to Signal's need for foreign workers.  Upon information and belief, Signal and Burnett entered into a written retainer agreement.  Under the retainer agreement, however, Signal would not be responsible for any legal fees owed to Burnett, but instead Burnett would receive compensation out of the "recruitment fees" paid by the foreign workers, including Plaintiffs.

### The Agents Recruited Plaintiffs and Other Indian Workers for Signal

63.     Upon information and belief, Defendants targeted Plaintiffs for recruitment based on their race and/or national origin.  Specifically, Defendants targeted Indian workers on the belief that the Indian workers would provide a source of cheap, compliant and potentially expendable labor.  The goal of this scheme was to maximize benefits to the Defendants—including the fees received by the Agents—at the expense of the Indian workers.

64.     Acting as Signal's recruiting agents for the purposes of facilitating the recruitment of Indian workers for employment at Signal, Pol and Dewan placed advertisements in newspapers throughout India and the United Arab Emirates in the spring, summer, and fall of 2006 offering opportunities for welders and fitters to immigrate permanently to the United States

under the auspices of Signal, a purported leading marine and fabrication company in Mississippi and Texas. Defendants targeted only Indian workers in their recruitment efforts—indeed, even the advertisements used in the United Arab Emirates were placed in Indian-language newspapers.

65.     Among other things, the advertisements and recruiting efforts promised "permanent lifetime settlement in USA for self and families," "permanent residency" in the United States, and/or "green cards." Upon information and belief, Pol and Dewan undertook these advertisements and other recruiting efforts on behalf of, at the direction of, and/or in coordination with Signal and Burnett.

66.     Signal authorized Pol, Dewan, and Burnett to act as their agents for the purposes of recruiting and providing Indian welders and fitters to fill anticipated H-2B guest worker jobs at Signal's Orange, Texas operations.

67.     Upon information and belief, Signal further authorized Pol, Dewan, and Burnett to represent that Signal would agree to sponsor bona fide green card applications for the Plaintiffs and obtain at least two H-2B visa extensions on behalf of Plaintiffs to allow them to remain in the United States working for Signal while their green card applications were being processed.

68.     Upon information and belief, Signal authorized these representations even though it knew or had reason to know that such visa extensions and green card applications would not be bona fide, valid, or lawful under United States immigration law and even though Signal did not have the intention at that time to apply for visa extensions and/or green cards on behalf of all the Indian workers, including the Plaintiffs.

69.     At the latest, Signal learned from the first Indian workers to arrive at Signal's facilities in Texas and Mississippi—workers who arrived well in advance of Plaintiffs—that those workers had paid exorbitant recruitment fees to the Agents, and had made those payments on the basis of promises of assistance in applying for and obtaining green cards which Signal knew was false.  Signal nonetheless continued to facilitate the transportation of hundreds more Indian workers to Signal worksites in Texas and Mississippi, including Plaintiffs, because it was in Signal's financial interest to do so.

### *Plaintiffs Incurred Substantial Debt to Pay the Agents' "Recruitment Fees"*

70.     In response to the advertisements posted by Pol and Dewan, Plaintiffs communicated with Pol and Dewan in the spring, summer, and fall of 2006 via telephone, and attended in-person meetings with Pol, Dewan, and Burnett.  During those meetings, the Agents informed Plaintiffs that the job opportunities that had been advertised were with Signal.  In addition, the Agents, acting on Signal's behalf, informed Plaintiffs of the opportunity to work for Signal on H-2B visas which would lead to permanent resident (green card) status.

71.     Specifically, the Agents promised recruits, including Plaintiffs, that Signal would sponsor Plaintiffs' green card applications and extend their H-2B visas multiple times to enable Plaintiffs to work in the United States while their green card applications were pending.  In exchange, each Plaintiff would have to pay fees totaling as much as 8 lakh rupees (approximately $18,000) in a series of approximately three installments.

72.     At the time Plaintiffs made their payments, one rupee was worth approximately $0.0225, and one lakh (100,000 rupees) was worth approximately $2,250.

73.     The Agents further informed recruits, including Plaintiffs, that they would be able to obtain legal permanent residence for their spouses and children.

74.     In addition, during the telephone communications, at recruitment meetings, and through written documents, the Agents (including through their employees) represented to Plaintiffs that Defendant Signal would provide lawful, stable, and ample employment opportunities, that working under an H-2B visa for Signal was not inconsistent with applying for permanent immigration status sponsored by Signal, and that Signal would obtain for Plaintiffs work-authorized green cards enabling the Plaintiffs to permanently and legally reside in the United States with their families.

75.     In such communications with Plaintiffs, the Agents further promised to act diligently and do everything necessary to ensure that Plaintiffs obtain green cards within 18-24 months of initiating the green card process.

76.     Upon information and belief, employees of Signal attended some of the meetings and testing sessions with potential workers in India.  Further, upon information and belief, prior to the meetings and testing sessions Signal and the Agents conferred regarding the logistics and substantive content of the meetings and testing sessions.

77.     In reasonable reliance on the Agent's promises regarding green cards and employment opportunities in the United States, Plaintiffs undertook considerable personal and familial sacrifices, including the mortgaging and/or sale of personal property and other incurrence of debt, in order to amass the funds necessary to initiate the green card process with Defendant Signal.   For example, Plaintiff Satheesh Kannan Marimuthu, Balamurugan Marimuthu, and Rajendran Sappani sold their wives' jewelry and/or mortgaged their families' homes to cover the recruitment fees.   In addition, several Plaintiffs relinquished stable employment in reliance on the Agent's representations.

78.     Reasonably relying on these and other promises made to them regarding green cards and work opportunities in the United States, Plaintiffs signed green card contracts with the Agents at various points from mid-2006 to early 2007 and paid the exorbitant recruiting fees required by the contracts.

79.     These contracts and other documents provided by the Agents promised that (1) Plaintiffs would work under a "permanent resident (green card) program," and (2) Plaintiffs would promptly receive a refund of all or nearly all of their payments if Defendants did not succeed in securing green cards for Plaintiffs.

80.     The Agents knew or should have known, however, that they would not refund Plaintiffs' money as promised in the contracts and other documents.

81.     The Agents induced Plaintiffs to enter into the green card contracts without intent to diligently pursue Plaintiffs' applications and without any basis whatsoever for representing that Signal had lawful long-term employment opportunities to provide Plaintiffs; that Signal could legally apply for numerous H-2B visa extensions to maintain Plaintiffs' presence in the United States; that working under an H-2B visa for Signal was not inconsistent with applying for permanent immigration status sponsored by Signal; that green card applications sponsored by the Signal would be valid and bona fide under U.S. immigration law; and that such applications were likely to be successfully completed and approved within the promised timelines.

82.     Plaintiffs would not have signed the green card contracts or paid the extraordinary recruitment fees charged by the Agents had they known that Defendants' promises and representations were false and that Defendants had failed to disclose material facts concerning the nature and terms and conditions of the immigration and work opportunities offered.

### *Defendants Arranged for H-2B Visas*

83.     On or about July 20, 2006, and August 17, 2006, the United States Department of Labor approved Signal's labor certification applications for 590 H-2B workers for the period of October 1, 2006 through July 31, 2007.

84.     In approving these applications, the United States Department of Labor relied on the accuracy of the applications' stated 10-month period of need.

85.     Upon information and belief, the Department of Labor's internal guidelines prohibit it from granting labor certification applications without relying on the applications' statement of need.

86.     In late August and early September 2006, the United States Citizenship and Immigration Service ("USCIS") approved Signal's H-2B visa petitions for 590 H-2B workers for the period of October 1, 2006 through July 31, 2007.

87.     In approving these visa petitions, the USCIS relied on the accuracy of the petitions' stated 10-month period of labor need and the representation that Signal's need was based on a one-time, peak-load, temporary demand. Indeed, according to regulation, the USCIS must rely on the stated period of the petitioner's labor need. *See* 8 C.F.R. 214.2(h)(6)(ii)(B) (2006).

88.     Defendants knew that the stated period of need in Signal's applications for labor certifications and for H-2B visas were inconsistent with Signal's promises of permanent residency to Plaintiffs and its actual projected labor need and, therefore, Defendants knew these statements to the government were false.

89.     The Agents used the H-2B visas, obtained from the federal government on the basis of false statements by Signal and Burnett, to elicit payments from Plaintiffs.

### Defendants Prepared to Bring Plaintiffs and Other Indian Workers to the United States

90.     At various times during the spring, summer, and fall of 2006, Signal employees and certain of the Agents traveled to various locations in India and the United Arab Emirates to test Plaintiffs' welding and pipefitting skills in anticipation of employing Plaintiffs in the United States.

91.     Plaintiffs paid to travel to the cities where these tests were held.

92.     Plaintiffs also paid admission fees in order to take these tests.

93.     Plaintiffs attended and passed these tests, which were overseen and graded by Signal and/or Dewan's agents, employees, and/or representatives.

94.     Upon information and belief, prior to attending these testing sessions the Agents and Signal conferred regarding the logistics and substantive content of the testing sessions.

95.     After USCIS visa approval, Plaintiffs made necessary preparations to travel to the United States on H-2B visas to work for Signal, including: paying to obtain necessary travel and legal documents; making payments to the United States Consulate and the Agents for mandatory H-2B visa and consular processing fees; attending H-2B visa interviews; and, paying the Agents for travel arrangements.

96.     In order to secure H-2B visas to work for Signal, Plaintiffs attended interviews with United States consular offices in Indian cities.

97.     To attend these consular interviews, Plaintiffs had to pay the costs of travel from their homes and/or current places of employment to various large Indian cities including Chennai (Madras) and Mumbai (Bombay).

98.     The Agents required that Plaintiffs meet with Global, Pol, and/or Burnett in these cities before attending their consular interviews.

99.    Upon information and belief, prior to these meetings, the Agents conferred among themselves and with Signal regarding the topics to be discussed and instructions to be given to Plaintiffs at these meetings.

100.    At the pre-interview meetings, the Agents ensured that Plaintiffs were up-to-date on paying the recruitment fee installments required by their green card contracts.

101.    Defendants further required that Plaintiffs pay an additional fee of 35,000 to 45,000 rupees ($787 to $1,012) for H-2B visa processing.

102.    The Agents required Plaintiffs to sign documents permitting Dewan to receive their visa-stamped passports from the consular offices on Plaintiffs' behalf.

103.    The Agents also coached Plaintiffs on what to say during consular interviews.

104.    The Agents told Plaintiffs that if they did not follow these instructions at their interviews, Plaintiffs would not receive their visas and would forfeit all of the money they had already paid to Defendants, in addition to losing the opportunity to permanently immigrate to the United States.

105.    During Plaintiffs' consular interviews, the consular officials took Plaintiffs' passports from them.

106.    Once Plaintiffs' visas were approved, consular officials sent the passports, with H-2B visas affixed, directly to Dewan.

107.    After Plaintiffs' visas were approved, the Agents made travel arrangements for Plaintiffs' departures to the United States.

108.    Before Plaintiffs could leave for the United States, however, Plaintiffs were required to attend final meetings in Dewan's office. Such meetings typically took place mere

hours before Plaintiffs' scheduled departures to the United States, when Dewan's office was full of other Indian workers anxiously awaiting their departure to the United States.

109.    At these meetings, Pol and Dewan collected final installment payments required by Plaintiffs' green card contracts.

110.    Pol and Dewan also required Plaintiffs—most of whom do not or did not at the time proficiently read or speak English—to sign English-language documents with little or no time for review.  They did not allow Plaintiffs to keep a copy of the documents.  Pol and Dewan or their staff demanded that Plaintiffs quickly sign the mandatory documents to avoid missing the flights to the United States and forfeiting the fees Plaintiffs had paid.

111.    Plaintiffs had no reasonable opportunity to review, negotiate, or make any changes to the documents presented to them.  Even when Plaintiffs asked Defendants what the documents said, Defendants refused to interpret or tell Plaintiffs what the documents said.

112.    Dewan also refused to provide receipts to Plaintiffs who requested evidence of the amounts paid prior to Plaintiffs' travel to the United States.

113.    Pol and Dewan refused to return Plaintiffs' passports—which had been in Defendant Dewan's possession since after Plaintiffs' H-2B visas were approved by consular officials—until Plaintiffs had paid the final installments and signed the mandatory paperwork.

114.    Without possession of their passports, and within this anxious and rushed atmosphere, Plaintiffs had no reasonable opportunity to review, negotiate, and/or make any changes to the documents presented to them.

115.    On occasions when workers failed to present sufficient funds to pay the final installment required by the green card contracts, Dewan and his associates threatened to destroy and/or deface the workers' passports.  Such threats were made in the presence of other workers,

causing the other workers to reasonably believe that they had no choice but to pay the final installments in full.

116.     Because of the Dewan and Pol's coercive behavior during these pre-departure meetings, and Plaintiffs' extraordinary and increasing levels of debt, Plaintiffs reasonably believed that they had no choice but to make the payments required by the Agents and to travel to the United States to work for Signal.

117.     Plaintiffs did not receive their passports from the Agents until Plaintiffs had fulfilled all of Defendants' requirements.

118.     At various times from late October 2006 to April 2007, Plaintiffs and other Indian workers traveled from Mumbai to the United States on tickets arranged by Pol and Dewan.

119.     Signal collected Plaintiffs at the Houston airport upon their arrival and transported them immediately to the Texas Labor Camp.

120.     Signal sent approximately 300 workers to its Pascagoula, Mississippi facility (the "Mississippi Labor Camp"), and approximately 290 workers were sent to the Texas Labor Camp upon arrival in the United States.

121.     Plaintiffs had no choice but to use the Agents to secure employment with Defendant Signal.  Management personnel at Signal prohibited Indian workers from securing employment at Signal's operations either through another recruiter or by bypassing recruiters altogether and applying directly with Signal.

### *Malvern Burnett Purported to Act As Plaintiffs' Attorney*

122.     At all relevant times, Burnett had an attorney-client relationship with the Indian workers, including Plaintiffs, for purposes of immigration issues and Plaintiffs' work for Signal.

123.     Upon information and belief, the Indian workers, including each Plaintiff, individually entered into an Attorney Services Agreement with Burnett.  Those agreements

provided the following: (a) Burnett would "represent [Plaintiff] as a licensed attorney in the United States of America and file all necessary documents with the government to assist [Plaintiff] make application for the permanent resident (green card) program;" (b) Plaintiff would pay Burnett $3750 for legal services; (c) Burnett would "do everything within [his] power to assist worker to obtain permanent residence status in the United States within 24 months;" (d) if Burnett failed to obtain permanent residence status, Burnett would refund recruitments fees to his clients subject to certain exceptions; and (e) either party could "terminate the agreement with 30 days notice given to the other party." Finally, the agreements provided that they "shall be construed, governed and enforced in accordance with the laws of the State of Maharashtra, India and where applicable in the State of Mississippi."

124.    As part of his services, Burnett prepared the immigration forms required for Plaintiffs to apply for H-2B status and, thus, to work for Signal in Texas. In those forms, Burnett represented to the U.S. Department of Homeland Security, under penalty of perjury, that the Plaintiffs would stay in the United States only temporarily, returning to India within the year. At the same time Burnett was submitting those forms, he was telling the Indian workers that they would be eligible for permanent residency, and that he would assist them in applying for green cards. Further, Burnett was aware of the representations Pol and Dewan had made to Indian workers, including Plaintiffs, about receiving green cards in connection with employment at Signal. Burnett also applied for H-2B visas for Plaintiffs despite the fact that H-2B visas are incompatible with permanent residency under federal law. Burnett misled Indian workers by conflating the H-2B visa and permanent resident status immigration processes in presentations to Indian workers during the recruitment process.

125.     In addition, Burnett filed with the Texas Workforce Commission completed ETA 750 forms and attachments seeking permission to import and hire 590 foreign guest workers (including Plaintiffs) under 8 U.S.C. § 1101(a)15(H)(ii)(b).   In the applications to Texas, Burnett, on behalf of Signal, stated that Signal would employ workers from October 1, 2006 through July 31, 2007.   Burnett knew that material representations—including those about the length of time the workers intended to stay in the United States—were false.   Burnett's statements in the applications contradicted Defendants' representations that he would assist Plaintiffs in obtaining permanent legal residence in the United States.

126.     Despite acting as Plaintiffs' attorney, Burnett concealed his true loyalties from Plaintiffs by failing to disclose that he had attorney-client and business relationships with Signal and other Defendants, and was actively working to promote Defendants' interest over those of Plaintiffs.

127.     Specifically, by mid-2006, Burnett had entered into an attorney-client relationship with Signal for the broad purpose of applying for and obtaining lawful status for Indian workers to come to the United States.   In 2007, Signal and Burnett entered into a Retainer Agreement memorializing the arrangement—namely, that Burnett would represent Signal at zero cost because the fees for his work were to be paid by the Indian workers, including Plaintiffs.   Burnett failed to disclose his attorney-client relationship or the payment arrangement with Signal to the Indian workers, including Plaintiffs.   Plaintiffs did not waive any conflict of interest caused by Burnett's relationship with Signal.

128.     Similarly, Burnett failed to disclose to Plaintiffs his attorney-client relationship with Dewan and Pol, which began no later than mid-2006.   Plaintiffs did not waive any conflicts of interest relating to this relationship.

129. Burnett also failed to disclose that he had a "Multilateral Business Agreement" with Dewan and Pol for the broad purpose of recruiting Indian workers to come to the United States. Plaintiffs did not waive any conflicts of interest relating to this relationship.

130. At all relevant times, Burnett preferred Defendants to his Indian clients even though he owed them the same duty of loyalty.

131. For example, in a clear violation of his professional obligations, Burnett forwarded e-mails he received from his Indian clients to third parties without the clients' permission.

132. Further, even though the attorney-client relationship between Burnett and Plaintiffs continued after Plaintiffs arrived in Texas, Plaintiffs were not generally allowed to speak or meet with Burnett in Texas. On one occasion, Signal representatives informed Plaintiff Satheesh Kannan Marimuthu that he could not meet with Burnett because it would "violate company policy." When Plaintiff Muruganandam Arumugam attempted to speak with Burnett, his calls went unreturned.

133. Upon information and belief, on another occasion, an Indian worker made a call to Burnett from the public telephone at the Texas Labor Camp to schedule a meeting. The receptionist at Burnett's office told the person that any Signal employees who attended such a meeting would have to pay $100 each to meet with Burnett.

134. Moreover, when questioned by certain Indian workers about the possibility of obtaining trafficking visas, Burnett represented to Indian workers that he did not know of anyone who had ever received a trafficking visa, and, thus, that the Indian workers would not be able to procure a trafficking visa. Upon information and belief, Burnett attempted to dissuade certain Indian clients from applying for these visas in order to benefit Signal.

135.    In contrast to his reluctance to communicate with Plaintiffs and other Indian workers, and in contrast to his failure to provide Plaintiffs accurate information regarding their immigration status, Burnett actively engaged with Defendants and continued to represent Signal in connection with the Indian workers.  Upon information and belief, Burnett continued to advise Signal on issues regarding the Indian workers and attended meetings with certain of the Indian workers at Signal's request.

136.    Burnett displayed a contemptuous attitude toward his Indian clients, which was demonstrated by the multitude of derogatory comments Burnett made about them.  For example, on one occasion, Burnett described his Indian clients' communication style as a "bamboo phone."

137.    On another occasion, when his Indian clients requested original documents rather than copies of those documents, Burnett referred to the clients as "dolts," asking, "What can't you make the dolts understand?" and signing the email as "[c]onfused and pissed."  (*David v. Signal International, LLC*, No. 08-1220, ECF No. 994-9 at 7.)

138.    Outside of his representation of Plaintiffs, Defendants Pol and Burnett played and compared scores achieved on the video game "Border Patrol," a game hosted on a well-known white supremacist website where the object is for the player to kill undocumented immigrants, including children.  (*David v. Signal International, LLC*, No. 08-1220, ECF No. 994-10 at 26.)

139.    Burnett (and the other Defendants) viewed the Indian workers as an exploitable source of fees.  This was poignantly displayed in an email Burnett sent to Dewan and Pol on December 16, 2006, regarding a Signal worker and client of Burnett.  The worker/client had stopped payment on a check to Burnett, and Burnett told Dewan and Pol to ensure that "the idiot" restores the payment and threatened to have the worker/client's visa "mysteriously"

revoked if he did not pay. Later in the email, Burnett referred to all the Indian workers, who were his clients, as "the idiots" and speculated about whether he should threaten them with "immediate deportation" in order to prevent them from stopping payment on future checks.

140. Likewise, Burnett recommended to the Agents that they refuse to provide an Indian applicant with a refund despite the fact that his father was dying with cancer, stating "[w]e did the work; we need to get paid." (*David v. Signal International, LLC*, No. 08-1220, ECF No. 994-10 at 29.)

141. To be sure, Burnett continued to engage in conduct that was tortious, perpetuate Defendants' fraudulent scheme, and violate the obligations owed to Plaintiffs after they arrived in Texas.

142. As discussed above, Burnett continued to have an attorney-client relationship with Plaintiffs and other Indian workers, but failed to disclose and obtain waivers for his attorney-client relationship with other Defendants. Indeed, Burnett actively promoted the interests of Defendants over those of Plaintiffs.

143. Further, once Plaintiffs were in Texas, Burnett failed to process Plaintiffs for green cards, failed to disclose that Signal was not going to process them for green cards, failed to provide them with critical information regarding their immigration status, and failed to refund any of the fees Plaintiffs paid him.

144. Finally, upon information and belief, Burnett participated in meetings with Signal and certain Indian workers in Texas during which the Texas workers were threatened with deportation if they engaged in organizing efforts similar to the Indian workers in Mississippi. During that meeting, Signal again represented that it would file for green cards on the workers' behalf.

145. Ultimately, Plaintiffs suffered the injury from Burnett's conduct in Texas.

***Signal Subjected Plaintiffs to Degrading and Discriminatory Conditions at the Texas Labor Camp***

146. Signal assigned Plaintiffs to work at its facility in Orange, Texas, and reside at the Texas Labor Camp, a crowded "man camp" consisting of trailer-like bunkhouses surrounded by barbed-wire fences and accessible only by a guarded entrance. When Plaintiffs Satheesh Kannan Marimuthu, Muruganandam Arumugam, and Muralidharan Arumugam first saw the Texas Labor Camp, they thought it was a prison.

147. Signal's lack of regard for the Indian workers was demonstrated in internal emails that ridiculed aspects of Indian culture and relayed anti-immigrant sentiments. For example, Signal (a) referred to an Indian worker as a "f*****g Keralite," (b) stated that it intended to go on a "rat hunt" to expose Indian workers who spoke out against Signal, (c) called Indian workers "chronic 'Whiners,'" and (d) joked about setting up an arena and taking bets on fights between Indian workers. (*David v. Signal International, LLC*, No. 08-1220, ECF Nos. 994-15 at 32, 994-14 at 37, 994-10 at 75, and 994-15 at 43-44.)

*Isolated Living Conditions*

148. The Texas Labor Camp was located miles away from shopping, places of worship, public transportation, or residential communities. This remote location was chosen purposefully by Signal to keep the Plaintiffs and other foreign workers segregated from the rest of Orange, Texas. In fact, Signal's workers and management went so far as to refer to the Texas Labor Camp as a "reservation."

149. The Texas Labor Camp gates were monitored by security guards retained by Signal. Signal's security guards required Plaintiffs to show employee identification badges and

recorded the time when Plaintiffs entered and exited the Texas Labor Camp. Signal's security guards also searched Plaintiffs' packages and bags when they entered the Texas Labor Camp.

150.    The Indian workers were not permitted to receive visitors in the Texas Labor Camp.

151.    Signal did not require any of its non-Indian employees to live in the segregated "man camps."

*Overcrowded and Unsanitary Bunkhouses*

152.    Signal packed up to 24 men into each bunkhouse, in two-tiered bunk beds. The bunkhouse was so congested that it was difficult for workers to move about or even to sit up in bed, and any semblance of privacy was impossible.

153.    Each of the bunkhouses contained workers who worked both day and night shifts, so Plaintiffs had difficulty sleeping due to the constant noise and the comings and goings of workers from different shifts.

154.    The bunkhouses contained insufficient toilets and bathing facilities. Each bunkhouse contained only one or two toilets, so Plaintiffs had to endure long lines, unsanitary conditions, and plumbing problems.

155.    These conditions failed to meet basic requirements of habitability and, not surprisingly, illness and disease were common.

*Rotten Food*

156. Food at the Texas Labor Camp was not readily available. Plaintiffs had to eat at Signal's mess halls, which were only open during limited hours. If the Indian workers arrived late for a meal, they were often denied food.

157. What food the Indian workers received was often rotten and came from kitchens that were not hygienic. As a result, the Indian workers frequently became ill and sometimes required hospitalization. Plaintiff Rajendran Sappani, for example, suffered from regular stomach ailments as a result of the poor food that required medicine to treat.

158. Further, Signal refused to accommodate religiously-based dietary restrictions. For example, Plaintiff Moorthy Madhamuni is a vegetarian by religion. He explained to Signal's representatives the fact that his religion required him to eat vegetarian, but they refused to provide vegetarian food. Likewise, Plaintiff Murganandam Arumugam was forced to choose between eating food he was allergic to (lamb and goat), eating food which violated his religious beliefs (beef and pork), or going hungry.

159. When Indian workers complained about not having enough clean plates on which to eat dinner, Signal responded, "Give them a paper plate that is firm enough to support the curry but flimsy enough to make them have to work at it and bitch."

*Signal Charged Plaintiffs $1,050 per Month For These "Accommodations"*

160. For the "privilege" of living in these deplorable conditions, Signal charged the Indian workers, including Plaintiffs, $35 per day (approximately $1,050 per month). Signal failed to inform most or all of the Plaintiffs of these fees during the recruitment process.

161. From this amount, $21 was allocated towards rent, and $14 towards food. The fee was deducted from Plaintiffs' paychecks automatically with no ability to opt out.

162.     Upon information and belief, Signal paid Indian workers a lower amount than Signal paid its non-Indian workers.

163.     Some of the Indian workers complained of the disgusting living conditions and requested to move out of the Texas Labor Camp.  Initially, Signal simply refused.  Eventually, Signal told workers that if they tried to live outside the Texas Labor Camp, Signal would still deduct the $35 per-day labor camp fees from their wages.  Given their already substantial debts, Plaintiffs had no reasonable choice but to continue living in the Texas Labor Camp.  While Plaintiffs were forced to pay these exorbitant fees because they had no reasonable financial alternative, Signal made over $730,000 in profit from the Mississippi and Texas man camps in just one year.

164.     Upon information and belief, Signal charged Plaintiffs' room and board in order to recoup the cost of building the man camps.  So anxious was Signal to recoup those expenses, that it even charged Plaintiff Muruganandam Arumugam for room and board while he was in the hospital recovering from an emergency surgery.  Signal did not require non-Indian workers to live at the Texas Labor Camp or to pay similar room and board expenses.

*Continuous, Abusive, and Discriminatory Supervision*

165.     Plaintiffs felt compelled to remain at the Texas Labor Camp, in part, because Signal created an environment of fear through constant, abusive, and discriminatory supervision.

166.     Signal's personnel and/or security guards deprived Plaintiffs of any sense of privacy by conducting surprise searches of the bunkhouse, searching worker's personal belongings, and even occasionally requiring that the Indian workers turn out their pockets.  Upon information and belief, non-Indian workers were not subject to similar treatment.

167.     As stated above, Signal's security guards monitored Plaintiffs and required them to show identification whenever they entered and exited the Texas Labor Camp and tracked Plaintiff's movements in and out of the camp. Upon information and belief, non-Indian workers were not subject to similar treatment.

168.     Plaintiffs were subjected to "no visitors" and "no alcohol" policies at the Texas Labor Camp. Violation subjected the workers to fines and suspension of work. Upon information and belief, non-Indian workers were not subject to similar policies.

169.     As stated above, Signal required Plaintiffs and other Indian workers to set up direct deposit bank accounts upon arrival to the Texas Labor Camp, to which Signal maintained access. Plaintiffs reasonably believed Signal could exert influence over Plaintiff's financial arrangements. Upon information and belief, non-Indian workers were not subject to similar requirements.

170.     The Indian workers, including Plaintiffs, were often given more difficult and dangerous jobs than the other non-Indian Signal workers. They were required to clean their equipment after work hours, while non-Indian workers were permitted to clean their equipment during the last 30 minutes of their shift. Indian workers were forced to take repeated "skills tests" that non-Indian workers were not required to take. And non-Indian workers were permitted to work more overtime hours than the Indian workers.

171.     Signal's personnel and supervisors frequently used offensive language while speaking with or referring to Plaintiffs and other Indian workers, including making anti-Indian comments.

172.     Signal threatened Plaintiffs and other Indian workers with deportation or adverse employment actions if they did not continue working for Signal, did not work according to

Signal's specifications, or complained about the working and living conditions. Upon information and belief, workers of non-Indian race, ethnicity, and alienage were not treated this way.

*Defendants' Continued Misrepresentations, Omissions, and Coercive Conduct*

173.    At meetings with Signal personnel, Indian workers voiced complaints regarding the discriminatory treatment to which they were being subjected. When Signal did not respond to the workers complaints, Indian workers at the Mississippi Labor Camp began meeting to discuss how to persuade Signal to improve conditions at the camp, and began meeting with third parties to discuss how to address their concerns.

174.    Upon information and belief, Signal became aware of these meetings and contacted the Agents to express concern about worker organizing efforts. Upon information and belief, Defendants met and decided on a course of action regarding steps to be taken to quell further worker organization efforts. The decided course of action was intended to have a deterrent effect on other Indian workers that might attempt to exercise their rights.

175.    Consistent with Defendants' plan, on March 8, 2007, Signal management met with Indian workers at the Mississippi Labor Camp and informed them that it would fight back against any "organizing" efforts, and that Signal would not extend any of the workers' H-2B visas if a single worker took legal action against Signal.

176.    On March 9, 2007, Signal's agents took five of the more vocal Indian workers at the Mississippi Labor Camp into "custody," fired them, and informed them that they would be deported. Distraught at what that meant for him and his family, one of the workers attempted to commit suicide. Demonstrative of Defendants' disregard for the Indian workers, in a media

interview, Signal's CEO referred to the suicide attempt as "theatrics, a bunch of nonsense." (*David v. Signal International, LLC*, No. 08-1220, ECF No. 994-8 at 12.)

177.    Later that same day, Plaintiffs learned about the events at the Mississippi Labor Camp.  Plaintiffs and other Indian workers became frightened by these activities, particularly when word spread that Signal had imprisoned Indian workers in Mississippi who had complained about the working conditions and that one worker attempted suicide rather than be deported and face the debts that he had incurred in India in order to come to Signal.

178.    Plaintiffs reasonably feared that if they tried to leave Signal's employ or oppose the conditions at the Texas Labor Camp, including by consulting with counsel, Plaintiffs would face forced deportation, physical restraint and detention, or other serious harms and/or abuses of the legal process at the hands of Signal.

179.    In addition, throughout the spring and summer of 2007, Signal representatives held meetings with Plaintiffs and other workers to discuss the status of Plaintiffs and other Indian workers' visas.  Through its agents, Signal continued to represent that it would arrange for H-2B visa extensions.  At no point during these meetings—indeed, at no point prior to termination— were Plaintiffs informed that they would not be receiving green cards.

180.    Signal was, in fact, evaluating the workers, including Plaintiffs, and had no intention of applying for visa extensions for all of the workers or applying for green cards for the workers.

181.    At various times, Signal refused to confirm whether it had obtained visa extensions for Plaintiffs.  As a result, Plaintiffs felt further compelled to continue to work for Signal and live at the Texas Labor Camp.  Upon information and belief, Signal prevented or

attempted to prevent Indian workers, including Plaintiffs, from consulting with lawyers about their situations.

182.    Despite many promises to do so, Defendants never provided the green cards or permanent residency.  In fact, no Defendant ever even applied for a green card for any Plaintiff. And, despite contractual provisions that clearly require them to do so, Defendants have failed to refund any of the money Plaintiffs paid to them for green card and visa processing.

### Plaintiffs Relied on Defendants' Representations

### Satheesh Kannan Marimuthu

183.    In or around September 2006, while working as a fitter in Singapore, Satheesh Kannan Marimuthu ("Satheesh") learned of an opportunity to work in the United States. Specifically, Satheesh saw advertisements in three newspapers, *Dinamalar*, *Dhinathanthi* and *The Hindu*, stating that fitters and welders were needed in the United States.  The advertisements further stated that applicants would be eligible for a visa and a green card and instructed interested parties to contact Dewan.

184.    In or around December 2006, Satheesh called Dewan, who confirmed that he was assisting in the hiring of fitters and welders for positions in the United States.  During this call Dewan explained that Satheesh would need to take a test at De Silva Engineering and that if he passed, he would get in an interview and that Dewan would begin processing his H-2B visa and green card.  Dewan also said there would be a service charge of eight lakhs (approximately $18,000).

185.    Satheesh called Dewan twice in January 2007 to confirm that there was a job vacancy for him and that he would get a green card.  Satheesh explained that he had a stable well-paying job in Singapore that he was unwilling to relinquish unless he had a job and a green

card lined up. Dewan told Satheesh that it was one hundred percent certain that Satheesh would receive a green card and that Satheesh should not pass up the rare opportunity to move to the United States with his family. Dewan stated that Pol and Burnett would work to ensure Satheesh received a green card.

186.    Only after Dewan promised a green card and the fitter job in the United States did Satheesh resign his fitter job in Singapore.

187.    In January 2007, Satheesh returned to India to take the test at De Silva Engineering. At this time, Dewan stated that Satheesh needed to pay the eight-lakh service charge and make two demand drafts of $5,000 each—one payable to Michael Pol and the other payable to Malvern Burnett. Dewan stated that the demand drafts were to cover attorneys' fees and that this payment would ensure Satheesh received a green card.

188.    After Satheesh passed the test at De Silva Engineering, Dewan and his employee, Salimon, informed Satheesh that he also needed to pay $1,000 for visa stamping at the embassy and an additional $400 for "medical fees" before he could begin working in the United States. Satheesh was instructed to contact Salimon only after he had compiled the necessary funds.

189.    To compile the funds demanded by Dewan, Satheesh was forced to pawn family jewelry, borrow $10,000 at a high interest rate from private lenders, and withdraw his life savings of $4,000.

190.    After Satheesh notified Salimon that he had funds sufficient to pay the recruiting fees, Salimon instructed Satheesh to come to his office in Chennai, India to make the first payment of $1,000, which Satheesh did. Salimon accepted the money on behalf of Dewan and again confirmed that Satheesh would receive a green card in exchange for the payment. Satheesh requested a receipt for his payment, which Salimon refused to provide.

191.    After receiving the payment from Satheesh, Salimon filled out the paperwork Salimon stated was necessary for visa processing and notified Satheesh that he was scheduled for an interview at the United States Consulate in Chennai about three days later. Salimon called Satheesh two days after the interview to inform him that Satheesh's visa had been approved and that Salimon was holding Satheesh's passport.

192.    Salimon eventually notified Satheesh that his flight to the United States would leave from Mumbai on February 15, 2007.  Satheesh was instructed to bring funds for the remaining recruitment fees to Dewan's office.  When he arrived, Dewan took Satheesh's payment, but again refused to provide receipts.  Only after taking the payment did Dewan return Satheesh's passport.

193.    Satheesh departed India for the United States on February 15, 2007.  A Signal employee picked Satheesh and others up from the airport in Houston, Texas and brought them directly to the Texas Labor Camp.  Satheesh thought the labor camp was a prison the first time he saw it.

194.    Prior to receiving Satheesh's payments, Dewan and Salimon represented that Satheesh would be living in an apartment with two to three other workers when he arrived in the United States.  Dewan and Salimon represented that Satheesh's living conditions in the United States would be as good as, or better than, his living conditions in Singapore.  As discussed above, the living conditions were far from what was promised.

195.    In addition, Signal supervisors regularly made racial and ridiculing comments about the Indian workers, including Satheesh, and gave the most difficult and dangerous jobs to Indian workers.

196.    Signal employees further threatened that if Satheesh left the labor camp he would be fired and that Signal would stop processing his immigration status.  Because of these statements, and his debt in India, Satheesh felt trapped, that could leave the Texas Labor Camp, and that he could not leave Signal's employ.

197.    In March 2007, Signal held a meeting at which Satheesh and other workers were told that they had to stay in the labor camp and that they could only eat the food cooked at the camp.  Signal representatives stated that anyone who did not comply with these rules would lose their job and be deported.

198.    In April 2007, Signal held another meeting, during which they notified Satheesh and others that only some of the workers would have their visas renewed.  Signal stated that those workers whose visas had not been renewed would be deported.

199.    Because Signal and Dewan frequently represented that Michael Pol and Malvern Burnett were Satheesh's lawyers for immigration matters, Satheesh requested to speak with and/or meet with Michael Pol and Malvern Burnett.  Signal employees refused, stating that Satheesh's request would violate company policy.

200.    Defendants have never returned any of the "recruitment fees" incurred by Satheesh and never provided a green card for Satheesh or his family.

201.    Satheesh relied upon Defendants' promises of permanent residency, long-term employment, and good working conditions.  He would not have incurred substantial debt, relinquished prior employment, or agreed to work for Signal in the absence of such false promises.  Because of his fear that Signal would attempt to deport him, his fear of mistreatment and abuse by Signal, and his need to repay the substantial debts he and his family had incurred to

pay Defendants' recruiting fees, Satheesh felt intimidated into acquiescence and compelled to continue working for Signal.

*Balamurugan Marimuthu*

202.     Balagmurgan Marimuthu ("Marimuthu") is from Trichy, India.   In or around August 2006, he saw an advertisement for a job opportunity for welders and fitters in the newspaper *Dinamalar*.

203.     Interested in the possibility of additional income, Marimuthu traveled to Chennai, India to interview for the position.  At the interview, Pol and Dewan told Marimuthu he must pay 20,000 rupees (approximately $450) as an interview fee and for a medical examination. Marimuthu declined to pay the fee.

204.     Shortly after the interview, however, Marimuthu saw a second advertisement in *Dinamalar*.  The advertisement promised employment in the United States and green cards for the workers and their families.  Marimuthu was extremely interested in the possibility of working in the United States and receiving green cards for himself and his family.

205.     The advertisement indicated that interested applicants should appear on November 8, 9, or 10 at De Silva Engineering in Chennai, India for an interview.  Marimuthu again travelled to Chennai and interviewed on November 8, 2006.

206.     At the interview, Marimuthu learned that the job opportunity was with Signal International.  Pol, Dewan, Burnett, and representatives from Signal attended this interview session, along with 40 to 50 potential workers.

207.     During the interview, Pol and Burnett asked Marimuthu about his previous work experience.  Marimuthu explained his prior work experience in Singapore, and described the accommodations, food, and benefits that were provided by the employer. Pol and Burnett

promised that Signal would provide the same type of accommodations, food, and benefits. Consistent with the advertisement, Pol and Burnett also promised that Signal would provide green cards for Marimuthu, his wife, and his daughter.

208.    Subsequently, one of Signal's representatives administered a test to Marimuthu to determine his capabilities as a fitter, which Marimuthu passed.

209.    After he passed the test, Dewan and his employee, Salimon, informed Marimuthu and the other workers who passed the test that they would enter the United States on an H-2B visa and would be processed for a green card once they arrived in the United States.

210.    Dewan then told the workers that this opportunity would cost 8 lakhs (approximately $18,000) and represented that this fee would be used for processing of the workers' green cards.

211.    Dewan told Marimuthu he would have to make an initial deposit of 35,000 rupees (approximately $787), and then pay Pol and Burnett $5,373 each by demand draft.  Marimuthu understood that Burnett was an American lawyer that was assisting him with obtaining his green card, among other things.

212.    Based on the representations from Dewan, Pol, and Burnett, including the representations about receiving a green card for himself and his family, Marimuthu was willing to pay the required recruitment fees.  To that end, on November 14, 2006, Marimuthu paid approximately 35,000 rupees he had saved from his work in Singapore.

213.    Marimuthu knew he would need to interview at the United States Consulate to work for Signal.  He asked Dewan when his interview with the Consulate would be, but he was told he first had to pay an additional two lakhs (approximately $4,500).

214. Marimuthu did not have enough money to pay the additional fee and believed it would take him about three years to earn one lakh in India. As a result, he borrowed money from his father and a Tamil Nadu society. As collateral for the latter loan, Marimuthu provided his wife's jewelry (despite deep sentimental and cultural value).

215. Marimuthu also borrowed four lakhs (approximately $9,000) from his uncle at a significant monthly interest rate. As collateral, Marimuthu offered title to his house. Marimuthu only agreed to these terms because he believed he would be able to pay his uncle back quickly once Marimuthu arrived in the United States.

216. Pol and Burnett scheduled Marimuthu's interview at the Consulate for December 4, 2006 in Chennai.

217. Prior to the interview, on December 3, 2006, Salimon meet with Marimuthu and coached him on what to say during the interview.

218. Marimuthu attended the Consulate interview on December 4 and was approved for a visa. The Consulate informed Marimuthu that his passport would be sent to his home by courier and gave Marimuthu a courier receipt.

219. After the interview, Marimuthu met Salimon at a hotel in Chennai. Salimon took Marimuthu's paperwork, including the courier receipt for the passport. Salimon told Marimuthu he would keep Marimuthu's passport, and that he would call when the visa in the passport was stamped. Salimon did not return Marimuthu's passport after it was stamped with the visa.

220. On December 8, 2006, Salimon instructed Marimuthu to take out demand drafts for Pol and Burnett. Salimon also informed Marimuthu his flight to the United States was booked for December 13, 2006.

221.     Believing that he would receive a green card for himself and his family, Marimuthu obtained two demand drafts payable to Pol and Burnett, each in the amount of $5,373.00 (upon information and belief, these demand drafts were required to be paid in United States dollars). Marimuthu wrote in the memo line of the drafts "green card fees." He paid an additional six lakhs (approximately $13,500) to Dewan in cash.

222.     Two days before leaving for Chennai, Salimon contacted Marimuthu and told him he would need to arrange and pay for his travel from Trichy to Chennai, as well as pay for medical testing. Marimuthu had not been previously informed that he would be responsible for these travel and medical fees, which totaled about 15,000 rupees (approximately $337). Marimuthu told Salimon he did not believe he should have to pay these fees. Salimon told Marimuthu that if he did not, Signal would cancel his flight to the United States and Marimuthu would forfeit the payments he had already made. Marimuthu felt threatened, and he worried that he might lose his money and the opportunity to work in the United States on a green card. As a result, he received a last-minute loan from a distant relative for the additional 15,000 rupees.

223.     On December 12, 2006, Marimuthu travelled to Chennai. From there, Salimon gave Marimuthu a plane ticket to Mumbai.

224.     When he arrived at Dewan's office in Mumbai, Marimuthu attempted to negotiate with Dewan about reducing his recruitment fees, instead of charging the full eight lakhs. Dewan threatened to cancel Marimuthu's plane ticket if he did not pay the full amount.

225.     Fearful that he would forfeit the money he had already paid and the opportunity to receive a green card, Marimuthu made the final payments. He also paid an additional fee of 2,500 rupees (approximately $56) for a medical certificate that Signal said he would need to

enter the United States.  After these payments, Marimuthu was forced to sign several forms, which were in English, without adequate time to read and understand the forms.

226.    On December 13, 2006, Marimuthu traveled from Mumbai to Houston, Texas. Upon arriving in Houston, a Signal representative drove Marimuthu to the Texas Labor Camp. As described above, the conditions at the labor camp were horrid.  Marimuthu was shocked because he had been promised that the living conditions while working for Signal would be the same as those he described in Singapore.

227.    Marimuthu felt compelled to remain at the Texas Labor Camp and work for Signal because of the debt he had incurred to pay the recruiting fees and because he believed that, if he did so, Signal would obtain a green card for him and his family.

228.    Marimuthu also felt compelled to remain at the Texas Labor Camp and work for Signal, because Signal's employees and representatives threatened to deport workers if they did not do their jobs properly or if they tried to leave Signal.

229.    In September 2007, Signal held a meeting for the workers.  Signal told the workers that they were going to apply for one more H-2B visa extension, but that they would not be receiving the promised green cards.  This was the first time that Signal ever informed Marimuthu that it was not providing the promised green cards.

230.    True to form, neither Signal nor any of the other Defendants ever provided or applied for a green card for Marimuthu or his family.  Nor did they ever return any of the recruitment fees incurred by Marimuthu.

231.    Marimuthu relied upon Defendants' promises of permanent residency, long-term employment, and good working conditions.  He would not have incurred substantial debt, relinquished prior employment, or agreed to work for Signal in the absence of such false

promises. Because of his fear that Signal would attempt to deport him, his fear of mistreatment and abuse by Signal, and his need to repay the substantial debts he and his family had incurred to pay Defendants' recruiting fees, Marimuthu felt intimidated into acquiescence and compelled to continue working for Signal.

*Muruganandam Arumugam*

232.    In or around May 2006, Muruganandam Arumugam ("Muruganandam") learned of advertisements in two newspapers, *Dinathandhi* and *The Hindu*, stating that fitters and welders were being recruited to work in the United States. The advertisements instructed interested parties to contact Sachin Dewan and his company Dewan Consultants.

233.    Muruganandam was working as a welder in Singapore, but he was excited about the opportunity to live and work in the United States. He contacted Dewan. Dewan informed him that welding jobs were available in the United States and that Dewan could help him secure such a position. Dewan told Muruganandam that he would need to pass a welding test at De Silva Institute before he would be considered for any positions.

234.    Muruganandam traveled over 800 kilometers on four separate occasions to participate in the welder recruitment process. During one of these trips, Muruganandam met with Pol, Burnett and Dewan. At this meeting, Muruganandam was informed that, if he was selected, he would definitely receive a green card after he was hired for the welding job in the United States. He was also repeatedly assured that his family would eventually be able to join him in the United States and that his living conditions in the United States would be better than in Singapore, where Muruganandam lived in a private apartment with his wife and kids.

235.    Dewan also told Muruganandam that he would have to pay a service charge of eight lakhs (approximately $18,000) to Dewan Consultants to secure a green card and the

welding job in the United States. Of this amount, 35,000 rupees was due as a deposit before Dewan would arrange the necessary interview with the United States Consulate in Chennai.

236. After Muruganandam passed his welding tests, he was instructed to wait two to three months for a phone call from Dewan, which would inform him that it was time to interview at the U.S. Consulate. During this time Muruganandam returned to his stable welding job in Singapore which paid 750 Singapore dollars per week (approximately $540).

237. Eventually, Muruganandam was informed that it was time to return to India to participate in the Consulate interview. Muruganandam was instructed to bring the initial deposit of 35,000 rupees—nearly his entire life savings—to Chennai. As instructed, Muruganandam paid the money to Dewan, Burnett, and Pol.

238. After that meeting, Dewan's employee, Salimon, provided Muruganandam with paperwork to bring to the Consulate for the interview he arranged. During the interview, Muruganandam was informed that he could not get a visa through the Consulate in India because he was a permanent resident of Singapore. Muruganandam relayed this information to Dewan, who informed him that he would need to make an additional deposit of 165,000 rupees ($3,712) in order to continue the process.

239. To compile the funds demanded by Dewan, Muruganandam had to borrow 165,000 rupees from his mother-in-law. In late November 2006, Muruganandam paid this money to Salimon in Chennai. Salimon provided additional documentation to Muruganandam and instructed him to attend an interview at the U.S. Consulate in Singapore, which eventually granted Muruganandam a visa.

240. Because Muruganandam could not complete the welding tests, meet with Dewan and Signal's agents, and attend interviews at consulates in India and Singapore while also

working a full time job, he was forced to relinquish a stable, well-paying job in Singapore to pursue the position with Signal.

241.    Salimon instructed Muruganandam to gather the remaining 600,000 rupees. To do so, Muruganandam was forced to borrow the additional funds from his mother-in-law.

242.    When Muruganandam notified Salimon that he had the 600,000 rupees, Salimon instructed him to get on a plane from Chennai to Mumbai, which was leaving in a matter of hours, and to report to Dewan's office.

243.    Once in Mumbai, Muruganandam went to Dewan's office as instructed. While in a small room, surrounded by several intimidating people who worked for Dewan, Muruganandam paid the additional rupees to Dewan. He also signed various documents written in English that he did not understand.

244.    Only after Muruganandam paid the 600,000 rupees did Dewan give Muruganandam's passport back to him. Dewan then provided Muruganandam with a plane ticket to the United States which was scheduled to leave in a matter of hours.

245.    Murganandam departed India for the United States on February 1, 2007. A Signal employee drove Murganandam and others from the airport in Houston, Texas directly to the Texas Labor Camp. The first time he saw it, Murganandam thought the labor camp was a prison.

246.    Dewan had represented that Murganandam's living conditions in the United States would be as good as, or better than, his living conditions in Singapore. As described above, however, the living conditions were reprehensible, and Murganandam was forced to live in one of the labor camp's crowded trailers.

247.    As Signal was using two or three trailers in the Labor Camp for storage, Murganandam and other workers asked if the equipment could be moved to allow the workers to

spread out and have more sanitary living conditions. Signal refused to move the equipment and locked the trailer doors to prevent the workers from using the additional bathrooms and beds in the storage trailers.

248.    Because Signal often served spoiled food, or ran out of fish or chicken options, Murganandam was forced to choose between eating food he was allergic to (lamb and goat), eating food which violated his religious beliefs (beef and pork), or going hungry.

249.    Signal supervisors also treated Indian workers, including Murganandam, far worse than the non-Indian workers. For instance, the foreman regularly allowed the non-Indian workers to clean their equipment during the final thirty minutes the workers were scheduled to work each day. Conversely, the Indian workers were required to clean their tools every day after their shift had ended, which amounted to approximately thirty minutes of unpaid work each day. Similarly, the foreman allowed the non-Indian workers to work overtime far more frequently than the Indian workers.

250.    Signal employees threatened that if Murganandam left the labor camp on his own he would be fired and that Signal would stop processing his immigration status. Based on these statements and his debt in India, Murganandam felt trapped. He felt that he could leave the Texas Labor Camp or Signal's employ.

251.    Signal informed Murganandam that he could live outside of the Labor Camp, but that he would still be responsible for paying for the housing and food provided at the Labor Camp. Murganandam was never informed that Signal would charge him for food or housing before he left India.

252.    Signal only provided infrequent meetings for employees to express their grievances. Nevertheless, Murganandam could not attend these meetings because they were

always conducted at 5:00 p.m., during Murganandam's work shift. Moreover, the meetings were ineffectual for workers like Murganandam, because they were conducted in English and no translator was provided.

253. When Murganandam and a friend inquired about the status of their visas and green cards, a Signal representative declined to discuss their status. When Muruganandam called Burnett to discuss the status of his visa and green card, Burnett refused to return his calls.

254. Defendants have never returned any of the "recruitment fees" incurred by Murganandam and have never provided a green card for Murganandam or his family.

255. Murganandam relied upon Defendants' promises of permanent residency, long-term employment, and good working conditions. He would not have incurred substantial debt, relinquished prior employment, or agreed to work for Signal in the absence of such false promises. Because of his fear that Signal would attempt to deport him, his fear of mistreatment and abuse by Signal, and his need to repay the substantial debts he and his family had incurred to pay Defendants' recruiting fees, Murganandam felt intimidated into acquiescence and compelled to continue working for Signal.

*Muralidharan Arumugam*

256. In or around March 2006, Muralidharan Arumugam ("Muralidharan") saw advertisements in two local newspapers for welding and fitting jobs in the United States. The advertisements indicated that interested parties should contact Dewan Consultants.

257. Around July 2006, Muralidharan attended a meeting at Dewan Consultants. Sachin Dewan ran the meeting with the assistance of Salimon, Pol and Burnett. During this meeting Muralidharan and the other attendees were advised that Signal had fitting and welding jobs available in the United States. The attendees were advised that whoever secured a job

would earn $18 per hour for 50 hours of work per week, that food and lodging would be provided, and that each worker would get a green card. To be considered for these positions, Muralidharan and the other attendees would need to pass performance tests and pay approximately six lakhs (approximately $13,500).

258. Encouraged by the prospect of working in the United States, Muralidharan took and passed the requisite tests right after the initial meeting at Dewan Consultants.

259. Sachin Dewan said he would schedule a visa interview for Muralidharan at the U.S. Consulate as soon as Muralidharan paid 1.5 lakhs (approximately $3,375).

260. In order to meet Dewan's demand, Muralidharan mortgaged his family's agricultural land against his father's wishes. Muralidharan used the money he raised to pay 1.5 lakhs to Dewan for his Consulate interview.

261. Muralidharan successfully completed his Consulate interview around November 2006. Muralidharan promptly notified Dewan that he had passed and that he was ready to continue with the process.

262. In or around December 2006, Muralidharan attended a second meeting with Dewan Consultants. During this meeting Muralidharan learned that the cost to work in the United States had increased to eight lakhs (approximately $18,000), rather than the six lakhs he was originally quoted.

263. At the same meeting, Dewan told Muralidharan that he needed to pay a second deposit of $10,746 towards this amount in the form of two $5,373 demand drafts—one payable to Pol and the other payable to Burnett. Dewan represented that these payments would ensure that Muralidharan received a green card, which would enable him to permanently live and work

in the United States. After receiving a letter that confirmed he would receive a green card, Muralidharan paid the second deposit of $10,476 on December 9, 2006.

264.    To compile the funds demanded by Dewan, including the second deposit and the remaining amounts owed on the eight lakhs, Muralidharan mortgaged his father's house, pawned his wife's jewelry and took out private loans.

265.    As soon as Muralidharan compiled the necessary funds, he traveled to Mumbai and paid the remaining portion of the eight lakhs charged by Dewan. After Muralidharan paid, Dewan returned his passport and provided him with plane tickets for a flight to the United States that departed the next day.

266.    Muralidharan departed India for the United States on or about December 11, 2006. A Signal employee drove Muralidharan and others from the airport in Houston, Texas directly to the Texas Labor Camp. The first time he saw it, Muralidharan thought the camp was a prison.

267.    Prior to receiving his first paycheck, Muralidharan was not aware that Signal would deduct money for room and board.

268.    As described above, the living conditions at the camp were reprehensible. As a result of over-crowding, unsanitary conditions, and spoiled food, numerous workers, including Muralidharan, became ill seriously while living in Signal's Texas Labor Camp.

269.    Muralidharan contracted an intestinal virus or infection while living at Signal's Texas Labor Camp and had to have emergency surgery. Muralidharan remained bedridden in the hospital for four days following the surgery. Muralidharan departed from the hospital early because he could not afford to stay as long as he was advised to stay. Mulihandharan's hospitalization resulted in charges exceeding $30,000.

270.     Nonetheless, Signal continued to charge Muralidharan for food and accommodations while he was in the hospital, unable to work.

271.     As a result of the debt he had incurred to pay the recruiting fees and the fees for his hospitalization, as well as the promise of a green card, Muralidharan felt compelled to remain at Signal.

272.     Defendants have never returned any of the "recruitment fees" incurred by Muralidharan and have never provided a green card for Muralidharan or his family.

273.     Muralidharan relied upon Defendants' promises of permanent residency, long-term employment, and good working conditions.  He would not have incurred substantial debt, mortgaged his family's land, or agreed to work for Signal in the absence of such false promises.  Because of his fear that Signal would attempt to deport him, his fear of mistreatment and abuse by Signal, and his need to repay the substantial debts he and his family had incurred to pay Defendants' recruiting fees, Muralidharan felt intimidated into acquiescence and compelled to continue working for Signal.

*Satyanarayana Ellapu*

274.     In or around June 2006, while working as a structural welder in Andhra Pradesh, India, Satyanarayana Ellapu ("Satya") saw an advertisement in the local newspaper, *Eenadu*, for potential employment in the United States.  The advertisement stated that a "leading marine and fabrication company in Mississippi and Texas" was hiring welders and pipefitters for its facilities in the United States and was conducting tests on June 25, 26, and 28, 2006, for the positions.

275.     The advertisement also stated that the positions may include "permanent employment visas" and a "2 years [sic] contract."

276.    Satya was hopeful that the job opportunity would better enable him to provide for his family, for whom he was the sole breadwinner.

277.    On June 26, 2006, Satya traveled an hour from his village to a training center to take a test to determine his eligibility for hire at Signal.  Sachin Dewan and other Signal representatives were present at this meeting, along with 20 to 30 other welders and pipefitters. Satya passed the test and was instructed to return in three days.

278.    Three days later, Satya returned to the training center an attended an informational meeting with approximately 50 other workers.  Dewan and Burnett led the meeting.  Dewan informed the workers that the opportunities were for positions in Signal's facilities in Mississippi or Texas.  Dewan further informed the workers that they would receive an H-2B visa for the first 9 months of their employment with Signal, but that they would then be provided a green card.  Dewan indicated that the process would take four to six months and would cost six lakhs (approximately $13,500), of which one lakh (approximately $2,250) had to be paid up front.

279.    Satya complained about the cost to Dewan and Burnett.  They informed Satya that he had no choice—"If you want the job, you have to pay."  However, they also promised that the money would be "easily recovered" once Satya began working in the United States.

280.    In response to the workers' concern about the size of the up-front payment, Dewan and Burnett stated that the workers could pay 20,000 rupees (approximately $450) within 20 days and pay the balance later.  If the men paid the 20,000 rupees, they would be guaranteed the job.

281.    Dewan and Burnett then distributed applications explaining that the worker had to pay the recruiting fees in installments by demand drafts and cash.

282.     After the meeting, Satya returned to his village to discuss the opportunity with his family.  His family did not have enough money cover the recruiting fees, but they nonetheless encouraged him to apply—believing that a green card would assist Satya in providing for them.

283.     Because Satya's life savings totaled one lakh, he borrowed four and a half lakhs (approximately $10,125) from a lender with interest.  As collateral, Satya pledged his father's ancestral land and his home, which the lender threatened to repossess if Satya missed any payments.

284.     On July 20, 2006, Satya met with an employee of Dewan to make his first payment of 20,000 rupees.  The employee gave Satya four forms to sign.  The first form was for Global and explained the payment schedule and amounts.  The second form was for Burnett and explained the attorneys' fees for legal services, employment agreements, and labor certifications.  The third form explained Dewan's services.  The fourth form was an employment agreement with Signal.  Satya signed the four forms, trusting that Dewan had accurately translated them.

285.     Subsequently, Satya had several meetings with Dewan's employees in which he was asked to make additional payments, including fees for visa processing, bank drafts, and travel and accommodation in Chennai, where he interviewed with the United States Consulate.

286.     Prior to Satya's interview with the Consulate on November 3, 2006, Dewan contacted him and requested that he bring documents evidencing his land or inheritance, which Dewan claimed was necessary for the visa application.  Satya traveled to Chennai and met with Dewan two days before his interview with the Consulate. During this meeting, Dewan instructed Satya regarding what to say during the Consulate interview.

287.    After the Consulate granted Satya's visa, Dewan contacted Satya and informed him that he could leave for the United States as soon as he made a final payment of six lakhs (approximately $13,500).  Satya also had to borrow the funds necessary to make that payment.

288.    On December 12, 2006, Satya traveled to Mumbai to pick up his passport and plane ticket from Dewan's office.  After collecting Satya's fee payments, Dewan gave Satya a series of forms in English to sign.  Satya asked for a translation, but Dewan refused, citing the workers' imminent plane departure.  Satya believed he had no choice but to sign the forms even though he could not read them.

289.    After he signed the forms, Satya was given his plane ticket and passport.  Satya's plane left Mumbai shortly thereafter and arrived in Houston, Texas on or about December 13, 2006.  A Signal representative met Satya and other workers at the airport and drove them to the Texas Labor Camp.

290.    The morning following his arrival, Signal hosted an orientation for the new workers.  During that meeting, Satya learned for the first time that he would need to pay an additional $170 for his tools.  Satya was also forced to sign several more forms in English. When Satya asked Signal's representatives to explain what the forms said, they refused.

291.    As a result of the conditions at the Texas Labor Camp, Satya felt isolated, lonely, and anxious.  At one point, he was hospitalized with an eye injury resulting from the conditions in which he was forced to weld.  Satya did not complain, however, because he was fearful Signal would terminate his employment if he did.  His fear was based in part upon news that (1) Signal had threatened to deport a worker who refused to do a particular job; and (2) another worker missed two days of work and was forcibly deported by Signal.  Satya felt further compelled to

stay at Signal, because he could not repay the debts he incurred for the recruitment fees if he left and believed he would receive a green card if he stayed.

292.    Defendants have never returned any of the "recruitment fees" incurred by Satya and never received provided a green card for Satya or his family.

293.    Satya relied upon Defendants' promises of permanent residency, long-term employment, and good working conditions.  He would not have incurred substantial debt, relinquished prior employment, or agreed to work for Signal in the absence of such false promises.  Because of his fear that Signal would attempt to deport him, his fear of mistreatment and abuse by Signal, and his need to repay the substantial debts he and his family had incurred to pay Defendants' recruiting fees, Satya felt intimidated into acquiescence and compelled to continue working for Signal.

*Moorthy Nadhamuni*

294.    In November 2006, while Moorthy Nadhamuni ("Moorthy") was working as a fitter in Dubai, he learned of a job opportunity in the United States through an advertisement in the Indian newspaper, *Dinathandy*.  The advertisement was placed by Dewan Consultants, stated Dewan was seeking to fill permanent job vacancies, and promised employment in the United States along with permanent residency through a green card.

295.    As a result of the advertisement, Moorthy took an emergency leave from his position in Dubai and travelled to Chennai, India to attend an informational meeting about the opportunity.

296.    Pol, Dewan, his employee Salimon, and others were present at the meeting. During the meeting, Dewan told Moorthy that he had to pass a test, which cost 500 rupees

(approximately $11), to be eligible for potential employment.  Moorthy paid the 500 rupees and passed the test. Salimon contacted Moorthy three days later and instructed him to attend an upcoming meeting.

297.    Approximately one week later, Moorthy attended a general meeting led by Dewan.  Several other workers were present.  Dewan informed the workers that they had been selected to work for Signal International in the United States at either a Texas or Mississippi facility, that workers would be paid $14-18/hour, and that the workers would receive green cards.

298.    Dewan informed the workers that they would first have to attend an interview with the United States Consulate in Chennai.  If the interview went well, the workers would be given H-2B visa and would receive a green card approximately 18 months after working in the United States.  Dewan also promised the workers that, after they received their green cards, their families could join them in the United States.

299.    Dewan stated the green card processing would cost the workers eight lakhs (approximately $18,000) in three installments.  First the workers had to pay Dewan 35,000 rupees (approximately $787).  Second, the workers would have to pay $3,871 to Pol and $3,871 to Burnett in cashier's check by late January.  Finally, the workers would have to pay the remainder of the eight lakhs to Dewan.  Dewan further stated that the workers' green cards would be processed and their families could join them in the United States, but only if the workers paid these fees.

300.    Moorthy made the initial payment to Dewan with money he had saved from his previous employment.  To accumulate the remainder of the eight lakhs, Moorthy borrowed funds from a local lender, pledging his wife's land as collateral, and pawned his wife's jewelry.

301. After receiving Moorthy's initial payment, Dewan informed Moorthy that his interview with the Consulate was scheduled for December 2, 2006. Dewan also informed Moorthy that he must bring an additional 4,600 rupees (approximately $103) for visa processing.

302. On December 2, 2006, Moorthy arrived in Chennai. He met with Dewan prior to his interview, during which Dewan coached Moorthy regarding the interview and provided him with documents for the Consulate.

303. Moorthy was subsequently approved for a visa. After the approval, Dewan instructed Moorthy to make the final payment of $3,871 to both Pol and Burnett.

304. On approximately February 13, 2007, Moorthy met Dewan in Chennai and received a ticket from Chennai to Mumbai. Dewan said that Moorthy would receive the remainder of his ticket to the United States in Mumbai.

305. On February 14, 2007, Moorthy travelled from Chennai to Dewan's office in Mumbai. There, he and several other workers were called one by one to make their final payments to Pol, Burnett, and Dewan. Some workers were unable to make the payments and were informed by Dewan's representatives that they would not receive plane tickets and would forfeit all prior payments if they did not make the final payment in full. Having witnessed this, Moorthy felt compelled to make his payments. After making that payment, Moorthy was required to sign several forms in English, which Dewan's representatives refused to translate.

306. On February 15, 2007, Moorthy departed Mumbai for Houston, Texas. When he arrived in Houston, a Signal representative picked him up at the airport and brought Moorthy along with the other workers to the Texas Labor Camp.

307. Moorthy was appalled by the living conditions, which—as described above— were horrid. They were much worse than the living conditions he had experienced previously

when working in Dubai and Singapore.  Signal refused to serve vegetarian food, even though Moorthy is a vegetarian for religious reasons.  Meanwhile, Signal continued deducting fees from Moorthy's paychecks for food and accommodations.

308.    Moorthy felt trapped and believed that, because of the debt he had incurred, he had to continue working for Signal despite the reprehensible conditions.  In addition, based on the promises made to him previously, Moorthy also believed that he would receive a green card if he continued to work for Signal and that his family could eventually join him in the United States.  Accordingly, Moorthy continued to work for Signal without complaint.

309.    Defendants have never returned any of the "recruitment fees" incurred by Moorthy and never provided a green card for Moorthy or his family.

310.    Moorthy relied upon Defendants' promises of permanent residency, long-term employment, and good working conditions.  He would not have incurred substantial debt, relinquished prior employment, or agreed to work for Signal in the absence of such false promises.  Because of his fear that Signal would attempt to deport him, his fear of mistreatment and abuse by Signal, and his need to repay the substantial debts he and his family had incurred to pay Defendants' recruiting fees, Moorthy felt intimidated into acquiescence and compelled to continue working for Signal.

*Rajendran Sappani*

311.    In 2006, Rajendran Sappani ("Sappani") was working in Singapore when he learned about a newspaper advertisement placed by Dewan offering welders and fitters employment and permanent residency in the United States.

312.    Sappani learned that Dewan Consultants was holding interviews for the positions in Chennai, India, and that the last date to interview was November 11, 2006.

313.     On or around November 8, 2006, Sappani left his job in Singapore and returned to his hometown of Trichy, India, before travelling to Chennai for an interview and testing with Dewan.

314.     Sappani interviewed with Dewan and passed a written pipe fitting test.  After the test, Sappani he was required to pay eight lakh (approximately $18,000) for the employment opportunity, visa processing, and green card.  He was also required to make an initial payment of 45,000 rupees to Dewan.  Dewan also informed Sappani he would need to pass an interview with the Consulate and that, if the Consulate did not stamp his passport with a visa, Sappani would forfeit the 45,000 rupees payment.

315.     To raise the funds necessary to pay the recruitment fees, Sappani borrowed money from lenders.  To obtain one of the loans, the lender required Sappani to prove that the funds were for a green card.  Sappani contacted Dewan who faxed a letter to Sappani confirming that Sappani would be receiving a green card.  Sappani presented the letter to the bank and received the funds.  Sappani also sold his wife's jewelry—with the exception of her wedding band, which he used as collateral for a loan—and mortgaged his family's house and land.  As a result, his family now pays 1,000 rupees per month to live in the house.

316.     Subsequently, Sappani attended an interview with the United States Consulate and was processed for a visa.  In December 2006, prior to leaving for the United States, Sappani was instructed to travel to Dewan's office in Mumbai, where he paid the final recruiting fees, including an additional 1,500-rupee fee for a medical certificate.  Dewan withheld Sappani's passport until the final payments were made.  Sappani was then required to sign several papers quickly, without an opportunity to read them, before he received his ticket to travel to the United States.

317. On or about December 18, 2006, Sappani arrived at Signal's Orange, Texas facility. Sappani was shocked by the conditions at the Texas Labor Camp, which were much worse than he had experienced in Singapore. But Sappani felt that he could not turn back because have no way of repaying the money he had borrowed. As a result, Sappani was afraid to do anything that might create problems for him at Signal.

318. Defendants have never returned any of the "recruitment fees" incurred by Sappani and never provided a green card for Sappani.

319. Sappani relied upon Defendants' promises of permanent residency, long-term employment, and good working conditions. He would not have incurred substantial debt, relinquished prior employment, or agreed to work for Signal in the absence of such false promises. Because of his fear that Signal would attempt to deport him, his fear of mistreatment and abuse by Signal, and his need to repay the substantial debts he and his family had incurred to pay Defendants' recruiting fees, Sappani felt intimidated into acquiescence and compelled to continue working for Signal.

*Rajendran Subramani*

320. Rajendran Subramani ("Rajendran") is a welder and structural fitter from Tiruchirappali, India. Rajendran supports his mother and family financially.

321. In or about 2006, Rajendran was working as welder in Malaysia. His friend informed him about an advertisement in a Hindu newspaper offering the opportunity to live and work in the United States as welder or fitter and obtain a green card. Rajendran reviewed the advertisement and confirmed that it promised the opportunity to get a green card in the United States. To take advantage of this opportunity, Rajendran travelled to India to interview for a position.

322.     On or about January 7, 2007, Rajendran interviewed with Salimon, an employee of Dewan.   Rajendran understood that Dewan was recruiting workers on behalf of Signal. During this interview, Salimon represented to Rajendran that he would make $18.00 per hour in the United States, that there would be opportunities to receive overtime pay, and the job with Signal would last for at least two years.   Salimon further represented Rajendran would initially receive a visa every six months, but that after two years Signal would get a green card for Rajendran and help him bring his family to the United Sates.

323.     Despite the fact that Rajendran had a two-year contract for his job in Malaysia, he was very interested in obtaining a green card and earning an income that was higher than what he was making in Malaysia.   Rajendran felt that this employment opportunity would permit him to make a better life for his family and to support his aging mother.

324.     During the interview, Rajendran spoke with Salimon about his work arrangement in Malaysia and described the accommodations, food, and benefits that were provided by the employer.    Salimon promised Rajendran that Signal would provide similar type of accommodations, food, and benefits, including that he would only have to share an apartment with a few men.

325.     Salimon told Rajendran that it would cost him eight lahks for the opportunity to work for Signal and receive a green card.   Based on the representations that Salimon made on behalf of Signal, including the representations about receiving a green card for himself and his family, Rajendran agreed to pay the money.

326.     Rajendran had saved about 100,000 rupees during his time working in Malaysia, but still needed to borrow an additional 700,000 rupees to pay the recruitment fee.   Rajendran's mother used to work for a wealthy family, the Muthus, who agreed to loan Rajendran the

700,000 rupees at an interest rate of three percent (3%) per month, a total of thirty-six percent (36%) interest per year.

327.    In or about January 2007, Rajendran paid 40,000 rupees ($900) to Salimon as an initial deposit in order to obtain an interview with the U.S. Consulate.  Approximately four weeks later, Salimon called Rajendran and told him that his interview was scheduled for February 7, 2007.  Rajendran met with Salimon in Madras in order to coach him for interview.

328.    Rajendran met with the embassy on or about February 7, 2007, and after the meeting they told him that his passport would be sent to Salimon once it was stamped.  Several days after the interview with the embassy Rajendran received a phone call from Dewan saying that they had his passport, but that he needed to come to Dewan's office in Bombay to pay the remaining 760,000 rupees, which he did prior to departing for the United States.

329.    On February 15, 2007, Rajendran traveled to the United States.  A Signal employee picked up Rajendran and other Indian workers at the airport in Houston, Texas and drove them to the Texas Labor Camp.

330.    Rajendran thought that the Texas Labor Camp resembled a prison—it was very isolated, it was surrounded by a fence, and guarded by security guards.

331.    A Signal employee had Rajendran and other Indian workers complete paperwork when they arrived at the Texas Labor Camp.  Signal did not, however, translate or explain the paperwork for the Indian workers.

332.    At the Texas Labor Camp, Rajendran was required to share an overcrowded bunkhouse with more than twenty (20) men.  The bunk beds were so tightly packed together that Rajendran and others were forced to sleep with their suitcases in their beds with them.  The toilet and showering facilities were insufficient and unsanitary.  Indeed, there was only bathroom and

one shower between the twenty men.  There was no privacy at the bunkhouse and sleep was very difficult due to the close quarters, oppressive smells, and constant noise from the workers coming and going to their different shifts.

333.    As described above, the food that Signal provided was deplorable.  Rajendran often became ill from the food, which was frequently rotten and/or left out for long periods of time.

334.    Signal deducted approximately $1,050 per month from Rajendran's paychecks for room and board.  Prior to arriving at the Texas Labor Camp, Rajendran had not been informed this amount would be withheld from his paychecks.

335.    As a result of the conditions at the Texas Labor Camp, Rajendran asked Signal if he could live somewhere else, but he was told Signal would still deduct $1,050 per month from his paychecks if he moved.  Because of the substantial debt Rajendran had incurred to pay the recruitment fees, he could not afford to pay for accommodations outside the Texas Labor Camp and still pay Signal $1,050 per month.  Rajendran was, in effect, compelled to stay in the Texas Labor Camp.

336.    Rajendran and other workers complained to Signal about the awful conditions at the Texas Labor Camp.  In response, Signal threatened to send Rajendran and other workers back to India if they continued to complain or spoke to others about Signal's actions.  Faced with threats of deportation, and crushing debt in Indian, Rajendran felt compelled to continue his employment at Signal.

337.    Notwithstanding the prior promises of employment for two years and a green card for Rajendran and his family, during a meeting in June 2007, Signal informed Rajendran and the others who voiced concern about the conditions at the Texas Labor Camp that they could not

work for Signal after July 30, 2007 and that Signal would not renew their visas. At that point, Rajendran realized that the promises about the length of his employment and Signal obtaining a green card for Rajendran and his family were lies.

338. Defendants have never returned any of the "recruitment fees" incurred by Rajendran and never provided a green card for Rajendran or his family.

339. Rajendran relied upon Defendants' promises of permanent residency, long-term employment, and good working conditions. He would not have incurred substantial debt, relinquished prior employment, or agreed to work for Signal in the absence of such false promises. Because of his fear that Signal would attempt to deport him, his fear of mistreatment and abuse by Signal, and his need to repay the substantial debts he and his family had incurred to pay Defendants' recruiting fees, Rajendran felt intimidated into acquiescence and compelled to continue working for Signal.

*Venkata Satya Sivagi Rao Talabathulla*

340. In or about May 2006, while working as a structural welder in Andhra Pradesh, India, Venkata Satya Sivagi Rao Talabathulla ("Talabathulla") saw an advertisement in the local newspaper, *Eenadu*, for potential employment in the United States. The advertisement stated that an American company was hiring welders and pipefitters for its facilities in the United States. The advertisement gave certain dates for tests and interviews in Chennai, and provided the contact information for Dewan.

341. Talabathulla and three of his friends traveled to Chennai 16 hours by train to discuss the opportunity with Dewan. Dewan explained the job opportunity, represented that it was for long-term employment, that there was ample work, and that workers would be processed for green cards. Specifically, Dewan informed Talabathulla that he would work under an H-2B

visa for the initial nine months and then would be processed for and receive a green card. Dewan also explained that that Talabathulla would need to undergo a testing process that was being conducted over the next couple of days.

342.    Dewan required that Talabathulla pay two lakhs (approximately $4,500), within 10 days to proceed. Talabathulla needed to go back home to Andhra Pradesh in order to obtain the money. Before leaving to obtain the money, Talabathulla took and passed the fitting test. During the test, Talabathulla met Pol, who informed him that the job opportunity was for Signal. Pol reiterated the promise of permanent residency in the United States.

343.    Talabathulla paid two lakhs to Dewan in November 2006. In order to pay those funds, Talabathulla had to borrow money from his father, who in turn borrowed from lenders at an interest rate of 3% per month (43% per year).

344.    After receiving Talabathulla's payment, Dewan informed Talabathulla that he needed to pay an additional $5,373 to Malvern Burnett, $5,373 to Michael Pol, and another $3,680 to Dewan. Talabathulla ultimately paid these amounts. To do so, Talabathulla had to borrow more money from his father, who in turn borrowed the money from lenders, pledging his house as collateral for the loan.

345.    In December 2006, Talabathulla traveled to Dewan's office in Mumbai in order to receive his passport and airline ticket to the United States. Talabathulla arrived shortly before his plane was scheduled to depart for the United States. During this meeting, Dewan required that Talabathulla pay the remaining recruitment fees in order to receive his passport. Talabathulla felt that he had no choice but to follow Dewan's directions. After receiving Talabathulla's payment, Dewan gave Talabathulla his passport as well as an Offer of Employment letter from Signal that was in English and had not been translated. Dewan refused

to provide a receipt for the payment.  Before leaving for the United States, Dewan continued to assure Talabathulla that he would receive a green card.

346.    When Talabathulla arrived in the United States, Signal informed him that it going to deduct approximately $1,050 per month from his salary for room and board.  He was also informed that he would be charged these amounts regardless of whether he lived at the Texas Labor Camp.  This was the first time Talabathulla had heard that he would be charged for room and board.  As described above, the conditions at the Texas Labor Camp were deplorable. Because Talabathulla could not afford to pay for living expenses twice and repay his loans, he felt compelled to remain at the Texas Labor Camp.

347.    While he was at the Texas Labor Camp, Defendants continued to assure Talabathulla that he would receive a green card.

348.    During the spring of 2007, Talabathulla he that Signal had threatened to deport other Indian workers back to India.  Signal ultimately transferred Talabathulla to its facility in Pascagoula, Mississippi and reduced his wages.  In doing so, however, Signal again reiterated its promise that there would be ample work at the Mississippi facility, which ultimately turned out not to be true.  As a result of the threats of deportation and the debt he had incurred to pay the recruitment fees, Talabathulla felt compelled to remain at Signal, work at its Mississippi facility, and accept the lower wages.

349.    Defendants have never returned any of the "recruitment fees" incurred by Talabathulla and never provided a green card for Talabathulla.

350.    Talabathulla relied upon Defendants' promises of permanent residency, long-term employment, and good working conditions.  He would not have incurred substantial debt, relinquished prior employment, or agreed to work for Signal in the absence of such false

promises.  Because of his fear that Signal would attempt to deport him, his fear of mistreatment and abuse by Signal, and his need to repay the substantial debts he and his family had incurred to pay Defendants' recruiting fees, Talabathulla felt intimidated into acquiescence and compelled to continue working for Signal.

*Sammanasunathan Siluvaimuthu*

351.    In or around 2005, while working as a welder in Abu Dhabi, Sammanasunathan Siluvaimuthu ("Siluvaimuthu") saw a newspaper advertisement placed by Dewan seeking fitters and welders.  The advertisement offered the opportunity to work in the United States and obtain a green card.

352.    Siluvaimuthu spoke with Dewan and was told to attend an upcoming informational meeting if he was interested in the job opportunity.  During the call, Dewan promised Siluvaimuthu that he would receive a green card as part of the job opportunity.

353.    Siluvaimuthu subsequently attended the informational meeting, along approximately 100 other Indian workers.  Pol and Dewan were present at the meeting and explained the job opportunity.  Among other things, they represented that the job opportunity was with Signal and that Signal would obtain permanent residency for the workers in the United States.

354.    Pol and Dewan told Siluvaimuthu and the other workers that they had to pay recruitment fees for the job opportunity totaling the equivalent of six or seven lakhs.  They explained that the workers could pay the recruitment fees in three installments, if they did not have enough money up front.

355.    Siluvaimuthu did not believe he had enough money to pay the recruitment fees.

356. In or around November 2006, however, Siluvaimuthu learned that some of his friends were going to work for Signal through Dewan Consultants. Siluvaimuthu had dreamed of living in the United States, and decided to pursue the job opportunity with Signal. To that end, he met with Sachin Dewan in Chennai for testing. After passing the test, Dewan informed Siluvaimuthu that the recruitment fees had risen to 8.5 lakhs (approximately $19,125).

357. Siluvaimuthu was informed that he would have to pay 3.5 lakhs (approximately $7,875) up front. Siluvaimuthu paid the initial 3.5 lakhs by demand draft. To do so, Siluvaimuthu borrowed money from friends at an interest rate of 5 percent per month. Siluvaimuthu received a loan for the remainder of the 8.5 lakhs. As collateral for the loan, Siluvaimuthu pledged his house and his wife's jewelry.

358. Subsequently, Siluvaimuthu met with Dewan to pay the remaining recruiting fees. During that meeting, Dewan represented to Siluvaimuthu that he would receive a green card in approximately 6 months and then could bring his family to join him in the United States. Dewan further represented that the employment with Signal would be long-term and the living conditions would be comfortable, safe, and sanitary.

359. On or around November 24, 2006, Siluvaimuthu received a visa from the United States Consulate in Chennai. Following Siluvaimuthu's interview at the Consulate, Dewan kept Siluvaimuthu's passport.

360. Shortly before he was to leave for the United States, Siluvaimuthu attended a meeting at Dewan's office, during which he was forced to sign forms in English without a translation. Siluvaimuthu felt compelled to sign the forms because his plane to the United States was leaving shortly, he had paid the recruitment fees to Dewan, and Dewan still had his passport.

Dewan only returned Siluvaimuthu's passport immediately before he boarded the flight to the United States.

361.    When Siluvaimuthu arrived at the Texas Labor Camp, he was horrified by the conditions.  Signal subsequently informed him, for the first time, that it would deduct approximately $1,050 per month from his wages for room and board, regardless of whether he lived at the Texas Labor Camp.  Despite the conditions, Siluvaimuthu felt compelled to remain at the Texas Labor Camp and continue working because he could not afford to pay twice for room and board and also repay the debt he had incurred in India.

362.    Defendants have never returned any of the "recruitment fees" incurred by Siluvaimuthu and never provided a green card for Siluvaimuthu.

363.    Siluvaimuthu relied upon Defendants' promises of permanent residency, long-term employment, and good working conditions.  He would not have incurred substantial debt, relinquished prior employment, or agreed to work for Signal in the absence of such false promises.  Because of his fear that Signal would attempt to deport him, his fear of mistreatment and abuse by Signal, and his need to repay the substantial debts he and his family had incurred to pay Defendants' recruiting fees, Siluvaimuthu felt intimidated into acquiescence and compelled to continue working for Signal.

## FIRST CLAIM FOR RELIEF

## THE TRAFFICKING VICTIMS PROTECTION ACT OF 2003

Forced Labor (18 U.S.C. § 1589) (Trafficking with Respect to Peonage, Slavery, Involuntary Servitude, or Forced Labor) (18 U.S.C. § 1590)

*All Defendants*

364.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

365. Plaintiffs are authorized to bring these civil claims against Defendants pursuant to the civil remedies provision of the Trafficking Victims Protection Reauthorization Act of 2003 (TVPA), 18 U.S.C. § 1595.

366. Defendants attempted to and did subject Plaintiffs to forced labor in violation of 18 U.S.C. § 1589.

367. Defendants controlled Plaintiffs' ability to meet their basic needs, including their housing, food, and access to medical care and legal counsel and threatened to withhold access to these necessities if Plaintiffs refused to continue working for Signal.

368. Defendants forced Plaintiffs to live in guarded and gated camps.

369. Defendants coerced Plaintiffs into paying substantial recruitment fees prior to hiring Plaintiffs and subsequently forced Plaintiffs to work at Signal to satisfy their outstanding debts.

370. Defendants' scheme to isolate Plaintiffs, to coerce them to live in conditions causing psychological harm, and to limit their outside contacts, including unlawful discrimination in violation of 42 U.S.C. § 1981, was designed to convince Plaintiffs that they would suffer serious harm, including financial ruin, if they left the employ of Signal.

371. Defendants retaliated against Plaintiffs for attempting to exercise their legal rights, threatened Plaintiffs with deportation, and deceived Plaintiffs about the terms of their immigration status in a manner that constitutes an abuse of the legal process.

372. Defendants knowingly attempted to and did provide or obtain the labor and services of Plaintiffs by means of force, threats of force, and threats of physical restraint made to the Plaintiffs in violation of 18 U.S.C. § 1589(a)(1).

373.     Defendants knowingly attempted to and did obtain the labor and services of Plaintiffs by means of serious harm or threats of serious harm to Plaintiffs in violation of 18 U.S.C. § 1589(a)(2).  Further, Defendants knowingly attempted to and did obtain the labor and services of Plaintiffs using a scheme, plan, or patter that, in the totality of the circumstances, was intended to coerce and did coerce Plaintiffs to believe that they would suffer serious harm if they were to leave Signal's employ, all in violation of 18 U.S.C. § 1589(a)(2).

374.     Defendants knowingly attempted to and did provide or obtain the labor and services of Plaintiffs by means of the abuse or threatened abuse of law or legal process in violation of 18 U.S.C. § 1589(a)(3).

375.     Defendants knowingly attempted to and did provide or obtain the labor and services of Plaintiffs by using a scheme, plan, or pattern intended to cause Plaintiffs to believe that, if they did not perform such labor or services, Plaintiffs would suffer serious harm or physical restraint, in violation of 18 U.S.C. § 1589(a)(4).

376.     Defendants knowingly recruited, transported, harbored, provided, and/or obtained the Plaintiffs for labor and services in violation of laws prohibiting peonage, slavery, involuntary servitude, and forced labor within the meaning of the provisions of the Trafficking Victims Protection Act, 18 U.S.C. § 1590.

377.     In violation of 18 U.S.C. § 1590, and in addition to the violations of 18 U.S.C. § 1589 set forth above, the Defendants knowingly recruited, transported, harbored and/or obtained the Plaintiffs for labor or services in furtherance of Defendants' violations of the following provisions of Title 18, Chapter 77 of the U.S. Code:

a.     enticing, persuading, or inducing the Plaintiffs to go onboard an airliner, train and passenger van, and to go to various locations throughout the United Arab

Emirates, India, and the United States, with the intent that they may be held in modern-day slavery, violating 18 U.S.C. § 1583;

b.     knowingly and willfully holding Plaintiffs to involuntary servitude, as defined by 22 U.S.C. § 7102(5)(a) and (b), violating 18 U.S.C. § 1584;

c.     removing, confiscating, or possessing Plaintiffs' passports and other immigration documents in the course of, or with the intent to violate 18 U.S.C. §§ 1583, 1584, 1589, and 1590, violating 18 U.S.C. § 1592(a); and

d.     attempting to violate 18 U.S.C. §§ 1583, 1584, 1589, and 1590, violating 18 U.S.C. § 1594(a).

378.    As a proximate result of Defendants' conduct, Plaintiffs have suffered injuries to their persons, businesses, and property, and other damages.

379.    Plaintiffs are entitled to recover compensatory and punitive damages in an amount to be proven at trial, including attorneys' fees.

## SECOND CLAIM FOR RELIEF

### VIOLATIONS OF THE CIVIL RIGHTS ACT OF 1866 42 U.S.C. § 1981

*Defendant Signal (Signal International, LLC, Signal International, Inc., Signal International Texas, G.P., and Signal International Texas, L.P.)*

380.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

381.    Plaintiffs assert this claim pursuant to 42 U.S.C. § 1981 for declaratory relief, and damages against Defendant Signal.

382.    The actions of Signal, as set forth herein, violated Plaintiffs' rights to receive full and equal benefit of all laws as guaranteed by 42 U.S.C. § 1981, including Plaintiffs' rights to enjoy and benefit from non-discriminatory employment relationships with Signal.

383.     Specifically, Defendant Signal subjected Plaintiffs to discriminatory and offensive mandatory room and board arrangements at the Texas Labor Camp on the basis of Plaintiffs' race and/or national origin.

384.     Defendant Signal did not subject its non-Indian employees to the same or similar room and board arrangements.

385.     As set forth in the preceding paragraphs, Defendant Signal also imposed discriminatory job-related requirements and adverse terms and conditions of employment to which non-Indian employees were not similarly subjected.

386.     As set forth in the preceding paragraphs, through the actions and statements of its personnel referring to and/or directed at Plaintiffs and other Indian workers, Signal maintained an objectively hostile and abusive work environment on account of Plaintiffs' race and/or national origin.

387.     As set forth in the preceding paragraphs, Signal's discriminatory and offensive treatment of Plaintiffs was sufficiently severe that it created an objectively hostile work environment in violation of 42 U.S.C. § 1981.

388.     Plaintiffs reasonably perceived their work environment to be hostile, abusive, and discriminatory on the basis of their race and/or national origin.

389.     Signal's hostile, abusive, and discriminatory treatment of Plaintiffs and others similarly situated was unwelcome.

390.     Signal knowingly, willfully, maliciously, intentionally, and without justification acted to deprive Plaintiffs of their rights on the basis of Plaintiffs' race and/or national origin.

391.     As a result of Signal's unlawful acts, Plaintiffs have suffered injury to their property and/or persons.

392.    Plaintiffs seek all appropriate relief, including declaratory relief, attorneys' fees, costs of this action, and damages, including compensatory and punitive damages, in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF

VIOLATIONS OF THE KU KLUX KLAN ACT OF 1871
42 U.S.C. § 1985 and the Thirteenth Amendment

*All Defendants*

393.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

394.    Plaintiffs assert this claim pursuant to 42 U.S.C. § 1985(3) for declaratory relief, and damages against the Defendants.

395.    As set forth in the preceding paragraphs, Defendants conspired, agreed, planned and coordinated for, and acted in furtherance of, the purpose of depriving Plaintiffs of equal protection of their rights under the Thirteenth Amendment to the United States Constitution and its implementing and enforcing statutes (inter alia, 18 U.S.C. §§ 1589, 1590) to be free from forced labor, involuntary servitude, and trafficking in persons.

396.    As demonstrated above, Defendants were motivated by racial, anti-Indian, and/or anti-immigrant animus when they conspired to deprive Plaintiffs of their rights and acted in furtherance of a conspiracy to deprive Plaintiffs of their rights.

397.    Defendants knowingly, willfully, maliciously, intentionally, and without justification planned and acted to deprive Plaintiffs of their rights.

398.    As a result of the unlawful acts of the Defendants, Plaintiffs have suffered damages.

399. Plaintiffs seek all appropriate relief, including declaratory relief, attorneys' fees, costs of this action, and damages, including compensatory and punitive damages, in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

### FRAUD AND NEGLIGENT MISREPRESENTATION

*All Defendants*

400. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs.

401. As set forth in the preceding paragraphs, Defendants, individually and through their agents, employees, and/or representatives, knowingly and/or negligently made materially false and untrue statements and representations to Plaintiffs regarding the nature and terms and conditions of applications and opportunities for immigration status and employment in the United States. Among other things, Defendants and/or their respective agents represented to the Plaintiffs that: (1) they would be eligible for permanent residency through their employment with Signal; (2) Defendants would apply for permanent residency in the United States on behalf of Plaintiffs; (3) Defendants would extend Plaintiffs' H-2B visas while they were being processed for permanent residency; and (4) Plaintiffs would have steady and ongoing work opportunities in the United States with Signal. Defendants and/or their respective agents also made false representations regarding the living conditions at the Texas Labor Camp.

402. As set forth in the preceding paragraphs, Defendants knowingly and/or negligently failed to disclose material facts to Plaintiffs regarding the nature and terms and conditions of applications and opportunities for immigration status and employment in the United States.

403. Defendants intended, or should have known, that the false statements made by Defendants and/or their agents, employees, and/or representatives would induce Plaintiffs to pay the exorbitant fees demanded by the Pol, Dewan, and/or Burnett.

404. Defendants intended, or should have known, that the false statements made by Defendants and/or their agents, employees, and/or representatives would induce Plaintiffs to leave their homes and jobs in India, Singapore and the United Arab Emirates and travel to the United States to work for Defendant Signal.

405. Plaintiffs were entitled to rely on Defendants' representations.

406. In reliance on Defendants' false and/or negligent representations regarding green cards and employment opportunities, Plaintiffs paid large sums of money to Pol, Dewan and/or Burnett, which directly benefitted Defendant Signal in the form of cheap labor and increased profits.

407. In reliance on Defendants' false and/or negligent representations regarding green cards and employment opportunities, Plaintiffs incurred substantial interest-bearing debts in order to pay recruitment, immigration-related, and travel fees charged by Defendants and their agents, employees and/or representatives.

408. In reliance on Defendants' false and/or negligent representations regarding green cards and employment opportunities, Plaintiffs sold personal and real property and surrendered employment opportunities in India, Singapore, and/or the United Arab Emirates.

409. In reliance on Defendants' false and/or negligent representations regarding green cards and employment opportunities, Plaintiffs left their homes and jobs and India and other countries and traveled to the United States to work for Defendant Signal.

410. At all times, Plaintiffs' reliance was reasonable.

411.    As a direct and proximate result of Defendants' knowing, willing, intentional, and/or negligent actions, Plaintiffs have been injured.

412.    Plaintiffs are entitled to recover compensatory and punitive damages in an amount to be proven at trial.

413.    This claim is recognized under the laws of Texas, Mississippi, and India.  The Court has previously indicated that Plaintiffs need not choose which jurisdiction's laws apply at this time (ECF No. 60 at 4-5; ECF No. 70).  Plaintiffs reserve the right to pursue these claims under the laws of Texas, Mississippi, or India (directly or in the alternative).

## FIFTH CLAIM FOR RELIEF

BREACH OF CONTRACT

*All Defendants*

414.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

415.    As set forth in the preceding paragraphs, Defendants, individually and/or through their agents, employees and/or representatives, offered to obtain permanent residence and immigration status for Plaintiffs in the United States within 18 to 24 months of the time when Plaintiffs entered into the United States, as well as to provide steady work opportunities in the United States with Defendant Signal in exchange for Plaintiffs' payment of exorbitant fees to Defendants and their employees, agents and/or representatives.

416.    Defendants also promised to return Plaintiffs' money if Defendants were unable to secure permanent residency on Plaintiffs' behalf.

417.    Plaintiffs accepted Defendants' offers and the parties entered into valid contracts.

418. Plaintiffs paid the agreed-upon fees, and performed the agreed-upon work, as required by the contracts.

419. Defendants breached their contracts with Plaintiffs by failing to comply with their binding promises regarding permanent residence and immigration status.

420. Defendants also breached their contracts with Plaintiffs by failing to comply with their binding promises to return Plaintiffs' money if Defendants were unable to secure permanent residence for Plaintiffs.

421. In reliance on these agreements, Plaintiffs paid large sums of money and entered into substantial debts, surrendered other employment opportunities, and incurred other financial losses.

422. As a direct result of Defendants' breach, Plaintiffs have suffered damages.

423. Plaintiffs are entitled to recover compensatory damages in an amount to be proven at trial.

424. This claim is recognized under the laws of Texas, Mississippi, and India. The Court has previously indicated that Plaintiffs need not choose which jurisdiction's laws apply at this time (ECF No. 60 at 4-5; ECF No. 70). Plaintiffs reserve the right to pursue these claims under the laws of Texas, Mississippi, or India (directly or in the alternative).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

    a.    Declaratory relief;

    b.    Compensatory damages;

    c.    Punitive damages;

    d.    An award of prevailing party costs, including attorney fees;

<ol type="e" start="5">
<li>A finding of alter ego between Signal International Texas, G.P. and Signal International Texas, L.P., thus piercing the corporate veil;</li>
<li>A finding of alter ego between Signal International Texas, L.P. and Signal International, LLC, thus piercing the corporate veil;</li>
<li>A finding that Signal International, Inc. is the successor in interest to Signal International LLC, or in the alternative, a finding of alter ego between Signal International LLC and Signal International, Inc., thus piercing the corporate veil;</li>
<li>A finding of alter ego among Malvern C. Burnett, Gulf Coast Immigration Law Center, L.L.C., and Law Offices of Malvern C. Burnett, A.P.C., thus piercing the corporate veil;</li>
<li>A finding of alter ego between Global Resources, Inc. and Michael Pol, thus piercing the corporate veil;</li>
<li>A finding of alter ego between Sachin Dewan and Dewan Consultants Pvt., thus piercing the corporate veil; and</li>
<li>Such other relief as the court deems just and appropriate.</li>
</ol>

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.

Date: September 16, 2014

By:   /s/ Eric H. Findlay
Eric H. Findlay
State Bar No. 00789886
Michael Findlay
State Bar No. 24077855
**FINDLAY CRAFT, P.C.**
102 N. College Ave., Suite 900
Tyler, TX 75702
Telephone: (903) 534-1100 (Office)
Fax:  (903) 534-1137
efindlay@findlaycraft.com
mfindlay@findlaycraft.com

*Pro hac vice applications to be submitted for the following counsel:*

James E. Dorsey (MN#137893)
Sten-Erik Hoidal (MN #35241X)
Timothy M. O'Shea (MN #386437)
Lousene Hoppe (MN #387171)
Andrew F. Johnson (MN #390783)
**FREDRIKSON & BYRON P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402
Telephone:  (612) 492-7000
Fax:  (612) 492-7077

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on September 16, 2014, all counsel of record were served with the foregoing document *via* the Court's electronic filing system.

*/s/ Eric H. Findlay*
Eric H. Findlay